# CV 16    2643

ORIGINAL



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK    DONNELLY, J.

------------------------------------------------------------x

CRAIG GOTTLIEB and SAUD A.H. KHOKHAR,
as Assignees of GIMMEGELT INC.,    BLOOM, M.J.

Plaintiffs,

-against-

ALPHABET, INC., and GOOGLE, INC.,

Defendants.

------------------------------------------------------------x

Docket No.:

COMPLAINT
PLAINTIFFS DEMAND
<u>JURY TRIAL</u>

The Plaintiffs, CRAIG GOTTLIEB and SAUD A.H. KHOKHAR, *Pro Se,* as Assignees

of GIMMEGELT INC., (Hereinafter collectively referred to as "Plaintiffs"), as and for their

complaint against the defendants, ALPHABET INC., and GOOGLE, INC., allege as follows:

## PARTIES

1.    Plaintiffs, CRAIG GOTTLIEB, residing in Queens County, City and State of New

York, and SAUD A.H. KHOKHAR, residing in Kings County respectively, City and State of

New York, are individuals, assignees of GIMMEGELT, INC., a Nevada Corporation, pursuant to

an Assignment of Damages and Cause of Action, dated December 7, 2014, as authorized and

adopted by a Corporate Resolution, by the GIMMEGELT, INC., on December 7, 2014. (See

Assignment of Damages and Cause of Action, together with the Corporate Resolution, made and

adopted by the GIMMEGELT, INC., both December 7, 2014 attached hereto as Exhibit "A" and

by reference made a part hereof).

2.    Defendant, ALPHABET, INC., who replaced the defendant, GOOGLE, INC., as

the publicly-traded entity by automatically converting all shares of GOOGLE, INC., into the

same number of shares of ALPHABET, INC., with all of the same rights, and the defendant,

GOOGLE INC., became a wholly-owned subsidiary of ALPHABET, INC. That upon information and both ALPHABET, INC., and GOOGLE, INC., (Hereinafter referred to as "GOOGLE") are Delaware Corporations with a headquarter and a principal place of business in Mountain View, California, and a sub office at 76 9th Avenue, 4th Floor, New York, NY 10011. Defendant, ALPHABET, INC., through its subsidiaries, provides online advertising services in the United States, the United Kingdom, and rest of the world. The company offers performance and brand advertising services. It operates through Google and Other Bets segments. The Google segment includes principal Internet products, such as Search, Ads, Commerce, Maps, YouTube, Apps, Cloud, Android, Chrome, and Google Play, as well as technical infrastructure and newer efforts, such as Virtual Reality. This segment also sells hardware products comprising Chromecast, Chromebooks, and NExhibitus. The Other Bets segment includes businesses, such as Access/Google Fiber, Calico, Nest, Verily, GV, Google Capital, X, and other initiatives.

JURISDICTION

3.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) (1).

4.      This Court has personal jurisdiction over the Defendants, ALPHABET, INC., and GOOGLE, INC., because the Defendants are incorporated in Delaware with a headquarter in Mountain View, California and sub-office in New York at 76 9th Avenue, 4th Floor, New York, NY 10011. Accordingly, service may be made upon the defendants, by serving the Secretary of State in Albany., New York. Further, under the long arms statute, the Court have jurisdiction over Defendants by virtue of extensive amount of business the defendants regularly conduct within the State of New York.

## BACKGROUND

5.      That on or about 2005, the Plaintiffs' predecessor, GIMMEGELT INC., entered into an agreement electronically, with GOOGLE with regard to its AdSense advertisement program in order to display their advertisement on its websites. In exchange of that the defendant, GOOGLE promised to pay a majority of the fees to the plaintiffs' assignor, paid to the defendant GOOGLE for these ads by advertisers. (See Agreements attached hereto as Exhibit "B" and "B-1" and a list of websites are attached hereto as Exhibit C"). The agreement provides in pertinent part that "14.    Miscellaneous...Governing Law;...All claims arising out of or relating to this agreement or service will be governed by California law, excluding California's conflict of law rules. (See Agreement attached hereto as Exhibit "B").


AdSense Program:

6.      The defendant's GOOGLE AdSense Program is a program for the website owners (known as publishers) to display GOOGLE's ads on their websites (advertisers ads) and earn money from GOOGLE as a result. To participate in this program, website publishers need to register with GOOGLE and be accepted into the program by GOOGLE. These ads shown on the publishers' websites are administered by GOOGLE and generate revenue on either per-click or per-thousand-ads-displayed basis. AdSense was launched by GOOGLE in March 2003 and constituted the second major milestone in GOOGLE's advertising model that generated significant additional revenues for the company.

7.      There are two ways for publishers to participate in the AdSense program:

(A)  AdSense for Search (AFS): publishers allow Google to place its ads on their Websites when the user does keyword-based searches on their sites. In other words, as a result of

a search, relevant ads are displayed as links sponsored by GOOGLE, and these links are produced using the same methods as on Google.com. Examples of such publishers include AOL and EarthLink. Moreover, the search results pages containing the ads are customizable to fit with the publisher's site theme, and may have a different "flavor" than the ads on Google.com.

        (B)    AdSense for Content (AFC): the system that automatically delivers targeted ads to the publisher's web pages that the user is visiting. These ads are based on the content of the visited pages, geographical location and some other factors. These ads are usually preceded by statement "Ads by Google." Google has developed methods for matching the ads to the content of the pages that also take into account the Cost Per Click (CPC) values when selecting the best ads to place on the page. The whole idea is to display ads that are relevant to the users and to what the users are looking for on the site so that they would click on the displayed ads. This is also combined with financial considerations (the Cost Per Click (CPC) factor) to maximize the expected revenues for Google from displaying the ad.  In both the AFS and the AFC cases, the publishers and Google are being paid by the advertisers on the Price Per Click (PPC) basis. Google does not disclose how it shares the clicking revenues with the publishers. What the publishers can see though, are the detailed online reports helping the publishers to track their earnings. These reports contain several statistics of clicking activities on the ads displayed on publisher's website. These statistics help the publisher to get an idea of how well his or her website is performing in the AdSense program and how much the publisher is expected to earn over time. As we can see from this description, there is a direct incentive for the publishers to attract traffic to their websites and encourage the visitors to click on Google's ads on the site to maximize their own AdSense income. They can do this in three ways:

        •    Build a valuable content on the site that attracts the most highly paid ads.

- Use a wide range of traffic generating techniques, including online advertising.

- Encourage clicks on ads using legitimate means (Google has a list of prohibited activities for the publishers, such as explicit requests to click on Google's ads that can lead to terminations of their accounts).

AdWords Program:

8.  Like AdSense, GOOGLE has another program The AdWords Program. AdWords is a program allowing advertisers to purchase CPC-based advertising that targets the ads based on the keywords specified in users' search queries. An advertiser chooses the keywords for which the ad will be shown on Google's web page (Google.com) or some other "network partner" pages, such as AOL and EarthLink, and specifies the maximum amount the advertiser is willing to pay for each click on this ad associated with this keyword. For example, an ecommerce portal MallRoad.com signs with Google AdWords program and is willing to pay up to $10/click for showing its ad (a link to its home page combined with a short text message) on Google.com when the user types the query "Hand Made Rugs" on Google.

9.  When a user issues a search query on Google.com or a network partner site, ads for relevant words are shown along with search results on the site on the right side of the Web page as "sponsored links" and also above the main search results. The ordering of the paid listings on the side of the page is determined according to the Ad Rank for the candidate ads that is defined as Ad Rank = CPC x QualityScore, where QualityScore is a measure identifying the "quality" of the keyword/ad pair. It depends on several factors, one of the main ones being the click through rate (CTR) on the ad. In other words, the more the advertiser is willing to pay (CPC) and the higher the click through rate on the ad (CTR), the higher the position of the ad in the listing is. There exists the whole science and art of how to improve the Ad Rank of

5

advertisers' ads, collectively known as Ad Optimization, so that the ad would be placed higher in the list by Google. Various tips on how to improve the results are presented on Google's website at https://adwords.google.com/support/bin/static.py?page=tips.html&hl=en_US. The top of-the-page placement rank is also determined by the above Ad Rank formula; however, the value of the QualityScore for the top-of-the-page placement is computed somewhat differently than for the side ads.

      10.    The actual amount of money paid when the user clicks on an ad is determined by the lowest cost needed to maintain the clicked ad's position on the results page and is usually less than the maximal CPC specified by the advertiser. Although the algorithm is known, the advertiser does not know a priori how much the click on the ad will actually cost because this depends on the actions of other bidders which are unknown to the advertiser beforehand. However, it is lower than the maximal CPC that the advertiser is willing to pay.  An advertiser has a certain budget associated with a keyword, which is allocated for a specified time period, e.g. for a day. For example, the MallRoad.com, the e-commerce portal wants to spend no more than $100/day for all the clicks on the ad for the keyword "Hand Made Rugs." Each click on the ad decreases the budget by the amount paid for the ad, until it finally reaches zero during that time period (note that more money is added to the budget during the next time period, e.g., the next day). If the balance reaches zero, the ad stops showing until the end of the time period (actually, the situation is somewhat more complex because Google has developed a mechanism to extend the ad exposure over the whole time period, but do it over short time intervals with long blackout periods; however, in the first approximation, we can assume that the ad stops showing when the balance reaches zero). For example, if the budget for the keyword "Hand Made Rugs" reached zero by the mid-day, then no ads for the e-commerce portal MallRoad.com

are shown for the "Hand Made Rugs" query for the rest of the day (modulo the previous remark). However, the ad is resumed the next day, assuming that the e-commerce portal MallRoad.com has signed up with Google for the next day.

11.    This is one of the motivations for the click fraud with the purpose to hurt other advertisers. If an advertiser or its partner can deplete the budget of a competitor by repeatedly clicking on the ad, the competitor's ad is not being shown for the rest of the time period, and the advertiser's ad has less competition and should appear higher in the paid ads list. Moreover, the advertiser may also end up paying less for his/her ad since there is less competition among the advertisers. Therefore, unethical advertisers or their partners not only hurt their competitors financially by repeatedly clicking on their ads, they also knock them out of the auction competition for the rest of the day by depleting their advertising budgets and thus improving their positions in the sponsored link lists and also paying less for their own ads.

12.    When search queries are launched on the network partners' websites, such as AOL or EarthLink, the PPC model works the same way as on Google.com with two caveats:

(a) the ads are displayed somewhat differently on these websites than on Google.com and

(b) Google shares parts of its advertising revenues with these partners. AdWords based on the CPC/PPC advertising model described above was launched in February 2002. It changed Google's business model and was responsible for generating major revenue streams for the company.

13.    AdWords which have different motivations for the unethical users to abuse the programs. Unethical users on AdWords constitute advertisers or their partners whose motivation is to hurt other advertisers. In contrast to this, the main motivation of the AdSense unethical

publishers is to enrich themselves through certain prohibited means. Therefore, motivations of these two groups of unethical users are significantly different. Although both motivations are important and should be addressed in the most serious manner, greedy motivations of unethical AdSense publishers constitute more serious problem for Google than the desire to hurt the competitors by unethical advertisers or their partners. This results in a significantly greater percentage of invalid clicks being generated by unethical AdSense publishers than by unethical AdWords advertisers (however, it is not clear if this statement is still true in terms of absolute numbers of invalid clicks generated by these two sources because of different volumes of clicks for the two programs).

Plaintiffs' Predecessor Performed the Agreement for AdSense Program:

14.     That in connection with AdSense program, Plaintiffs' through their webmasters and programmers and designers invested time, money and energy in creating and maintaining and enabling websites for public from all over the world to see and interact with the GOOGLE's AdSense program and websites that are part of the Google Network to deliver ads from the GOOGLE's AdWords advertisers that are relevant to the search results or content on their websites.

15.     That by reason of the foregoing, the Plaintiffs predecessor, and the Defendants share the majority of the revenues generated from these ads with the Google Network members including the plaintiffs' predecessor that displayed the ads on its websites.    Further, the advertisement of the ads on plaintiffs' websites via AdSense program enabled advertisers to extend the reach of their ad campaigns; and improved our ability to generate revenue from their content, and delivers relevant ads for their users and they depended on the income which the websites generated.   Defendants GOOGLE billed their advertisers for the advertisement placed

8

on the plaintiff's websites and collected revenue for the advertising traffic generated for bona fide consumers. However, in guise of plaintiff posing risk to the defendant GOOGLE AdWord advertisers, the defendant GOOGLE refused to pay to the Plaintiff for generating traffic.

16.    That from 2005 to May 27, 2012 the plaintiff's websites generated extensive advertising clicks revenues, however, on or about late May 27, 2012 plaintiffs predecessor found and discovered that the defendant GOOGLE had disabled its access to the AdSense long-standing accounts that profited GOOGLE and its advertiser and the Plaintiff's predecessor as publisher from 2005 to late May 27, 2012. After disabling the plaintiffs' account, the defendant GOOGLE by and through it's the Google AdSense Team advised the plaintiffs' predecessor that:

> "Hello Gimmegelt.
>
> While going through our records recently, we found that your AdSense account has posed a significant risk to our AdWords advertisers. Since keeping your account in our publisher network may financially damage our advertisers in the future, we've decided to   disable your account.
>
> Please understand that we consider this a necessary step to protect the interests of both our advertisers and our other AdSense publishers. We realize the inconvenience this may cause you, and we thank you in advance for your understanding and cooperation. If you have any question about your account or the action we've taken, please do not reply to this email.  You can find more information by visiting https://www.google.com/adsense/support/bin/answer.py?answer=57153&hl=en_US.
>
>
> Sincerely,
>
> The Google Team
>
> This message was sent from a notification-only email address that does not accept incoming email. Please do not reply to this message."

See The Google Team's Email attached hereto ad Exhibit "D" and made apart hereof)

17.     That on May 27, 2012, the plaintiffs' retrieved its May 2012 performance log report from The Google AdSense showing the plaintiffs' predecessor earned the sum of $91,848.43 in May, 2012. (See Exhibit "C" attached hereto and made apart hereof).

18.     That thereafter, the plaintiffs' predecessor by and through its Senior Technology Consultant, Mr. Brian Nowell of T324, Inc., attempted in vain to know the GOOGLE's mean by "posing a significant risk to its adwords advertisers".

19.     That thereafter the plaintiffs' predecessor filed an administrative appeal with GOOGLE in a timely manner with all supporting documents, if any, through its webhosting company, to review their account data in order to ascertain how the plaintiffs AdSense account has posed a significant risk to the GOOGLE's AdWords advertisers.  And how the plaintiffs account in GOOGLE's publisher network financially will damage its advertisers in the future, and upon completion of the investigation to reinstate the plaintiffs' disabled account. In response to that Google rejected the plaintiffs' predecessor in interest's Appeal with the instructions:

- That further appeals will not be considered,

- That GIMMEGELT INC., will not receive any further communication from Google,

- That GIMMEGELT INC., is not eligible for further participation in AdSense Program and

- That GIMMEGELT INC., cannot open new accounts anymore.

20. And by a decision reached on appeal, by an email dated May 31, 2012, attached hereto as Exhibit "E", The Google AdSense Team advised the plaintiffs' predecessor that:

"Hello,

Thank you for your appeal. We appreciate the additional information you've provided, as well as your continued interest in the AdSense program.
However, after thoroughly re-reviewing your account data and taking your feedback into consideration, our specialists have confirmed that we're unable to reinstate your AdSense account.

Please know that, once we've reached a decision on your appeal, further appeals may not be considered, and you might not receive any further communication from us. Note that AdSense publishers whose accounts are disabled for violations of our Terms and Conditions are not eligible for further participation in AdSense. For this reason, you may not open new accounts.

Also, accounts disabled for invalid click activity will receive no further payment nor any reissue of previous payment. Your outstanding balance and Google's share of the revenue will both be fully refunded back to the affected advertisers.

Thank you for your understanding in this matter.

We understand that you may want more information about your account activity. However, because we have a need to protect our proprietary detection systems, we're unable to provide our publishers with any details about their account activity.

Sincerely,
The Google AdSense Team"

(See The Google AdSense Team's Decision on Appeal dated May 31, 2012

attached hereto as Exhibit "E").

21. That the defendant GOOGLE refused to pay the plaintiffs the outstanding balance for April 2012 and May 2012 due to be paid within 90 days from said April 2012 and May 2012, totaling in the sum of $175,606.99 (April 2012 $83,758.56 + May 2012 $91,848.43 =

11

$175,606.99. In addition, although the partial payments for January 2012, February 2012, March 2012 totaling in the sum of $34,924.22 were paid on account by the Defendant GOOGLE to the plaintiffs' predecessor in interest, leaving the sum of $8,896.33 as unpaid balance for January 2012 $28.09, February 2012 $3,304.39, March 2012 $5,563.85. The defendant GOOGLE also received for the clicks from its advertisers from January 2012 through March 2012 in a sum unknown to plaintiffs at present and discovery will reveal this information.

22.     In addition, upon information and belief, despite disabling the a plaintiffs' account in late May, 2012, from June 2012 until the plaintiff's predecessor account was closed with its hosting company, T324, Inc., its website (www.indeedfinancialhelp.net) continued to generate clicks revenue from the defendants' AdSense program, thus generated substantial revenue from the ads with the Google Network members including the plaintiff's predecessor that displayed the ads on its websites.    Further, the advertisement of the ads on plaintiff's websites via AdSense program enabled advertisers to extend the reach of their ad campaigns; and improved our ability to generated revenue from their content, and delivered relevant ads for their users. Exact amount of the revenue the GOOGLE received from June 1, 2012 until the websites were shut down by the web hosting company is unknown to the plaintiffs and discovery will reveal this information.

23.     However, due to the plaintiff's inability to access its disabled AdSense long-standing accounts, the plaintiffs or their predecessor were unable to see the records or determine the advertising revenue generated during this period, thus the defendants GOOGLE unjustly enriched itself from that revenues at the plaintiff's detriment.   Exact amount of the revenues generated from June 1, 2012 until the plaintiffs websites were shut down by its web hosting company 324.com is not known at present and the discovery will reveal that amount.

24.     Upon information and belief, the defendant's GOOGLE advertisers were charged for the advertisement generated from the plaintiffs' predecessor websites from January 1, 2012 to May 27, 2012 and little if anything was refunded by the GOOGLE to its advertisers.

25.     Significantly, in its 2009 filing, the defendant GOOGLE addresses invalid clicks in its filing with the Security and Exchange Commission, Form Form-10K, Annual Report Pursuant to Section 13 or 15(d) of the Security and Exchange Commission Act of 1934, that if GOOGLE failed to detect click fraud or other invalid clicks, it could lose the confidence of its advertisers, which would cause its business to suffer since it has regularly refunded fees that its advertisers have paid to it that were later attributed to click fraud and other invalid clicks, and it expected to do so in the future. The defendant GOOGLE defines on page 26 of its 2009 Annual Report attached to the Form-10K, filed with the Security and Exchange Commission, "Invalid clicks are clicks that we have determined are not intended by the user to link to the underlying content, such as inadvertent clicks on the same ad twice and clicks resulting from click fraud. Click fraud occurs when a user intentionally clicks on a Google AdWords ad displayed on a web site for a reason other than to view the underlying content. While we have implemented systems to identify and reduce fraudulent and invalid clicks, an increase in refunds could negatively affect our profitability and damage our brand." (See Exhibit "F", page 26 of the Google's Form 10-K, Annual Report for 2009, accessed on 5-15/16 at http://www.sec.gov/Archives/edgar/data/1288776/000119312510030774/d10k.htm).

26.     Google Network Members (Publishers) do not pay any fees associated with the use of Google's AdSense program on its websites and according to its 2011 Form K-10 filing with SEC, in its 2011 Annual Report filed with SEC, the defendant Google reported in its 2011 filing: "We [Google] recognize as revenues the fees charged to advertisers each time a user

clicks on one of the ads that appears next to the search results or content on our websites or our Google Network Members' websites....Google AdSense revenues on a gross basis principally because we are the primary obligor to our advertisers."  (See Exhibit "G" attached hereto).

27.    Further GOOGLE recognize revenues when the services or products have been provided or delivered, the fees GOOGLE charges are fixed or determinable.

28.    In its yearly reports presented to its shareholders and filed with SEC Form 10-K during the period of 2010-2015, the defendant GOOGLE did not address invalid clicks GOOGLE generates or anything refunded or returned to the advertisers for invalid click.

29.    Google is a global technology leader focused on improving the ways people connect with information. It aspires to build products that improve the lives of billions of people globally. Its mission is to organize the world's information and make it universally accessible and useful. Its innovations in web search and advertising have made its website a top internet property and brand one of the most recognized in the world.  The Google generate revenue primarily by delivering relevant, cost-effective online advertising. Businesses use its AdWords program to promote their products and services with targeted advertising. In addition, the third parties that comprise the Google Network use its AdSense program to deliver relevant ads that generate revenue and enhance the user experience.

30.    While GOOGLE may have allegedly implemented systems to identify and reduce fraudulent and invalid clicks, based on the new technology developed by its competitor blocking GOOGLE's advertising and an increase in refunds negatively affected GOOGLE's profitability and damages to its brand, leading to the not refunding or returning any revenue to its advertiser and systematically cutting off and disabling the hard working publishers like the plaintiff who

14

brought traffic to GOOGLE and its network websites so that there would be more profit to GOOGLE and its network publisher like the plaintiff.

31.     Upon information and belief, during the period of 2010 to 2015, filing with the Security and Exchange Commission, Form Form-10K, Annual Reports Pursuant to Section 13 or 15(d) of the Security and Exchange Commission Act of 1934, no money was refunded to the advertiser by the GOOGLE thus these reports were inflated and based on the gross receipts the company's standing making significant money were made was reported which boosted its stock at publisher's financial detriment.

32.     That the defendant GOOGLE's refusal of the the legal right of Plaintiffs (publisher) to provide details of its account activity in AdSense program after disabling its account constitutes an unjust enrichment of the defendants.

33.     That unless discovery is done and testimony is taken at present it is hard for plaintiffs to arrive at any definitive conclusions beyond any reasonable doubt based on the facts that Google's invalid click detection methods "work well" and remove "most" of the invalid clicks and the provided responses upon disabling the Plaintiffs predecessor account and determination on an administrative appeal purportedly determining and finding that: "Also, accounts disabled for invalid click activity will receive no further payment nor any reissue of previous payment. Your outstanding balance and Google's share of the revenue will both be fully refunded back to the affected advertisers." (See The Google AdSense Team's Decision on Appeal dated May 31, 2012 attached hereto as Exhibit "E").

34.     While on the other hand in its initial notice GOOGLE claiming: "While going through our [GOOGLE} records recently, we found that your AdSense account has posed a significant risk to our AdWords advertisers.  Since keeping your account in our publisher

network may financially damage our advertisers in the future, we've decided to disable your account." (See The Google AdSense Team's Decision on Appeal dated May 31, 2012 attached hereto as Exhibit "E").

35.     According to the defendant GOOGLE's May 27, 2012 email and May 31, 2012 determination on appeal, is simply not hard enough and the defendant GOOGLE did not provide a compelling amount of conclusive response demonstrating the effectiveness of their approach that would satisfy the plaintiffs' instant claims leading to the instant action.

## AS AND FOR A FIRST CAUSE OF ACTION
### (VIOLATION OF CAL. CIV. CODE § 1671(b))

36.     Plaintiffs repeat and reiterate each and every allegation contained in paragraph # 1 through # 35 of the complaint and  incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

37.     That the defendant's GOOGLE AdSense agreement contains a liquidated damages provision that gives it the right to withhold a fixed or certain sum of 100% of the Plaintiffs assignor as publisher  unpaid amounts, or earned, but unpaid, revenue, upon termination of its account providing for in paragraph #10 of the agreement attached hereto as Exhibit "B" that "If we terminate the Agreement due to your breach or due to invalid activity, we may withhold unpaid amounts or charge back your account.".  Paragraph # 11 of the said agreement attached hereto as Exhibit "B-1 also provides in pertinent part that: "Google reserves the right to withhold payment or charge back Your account due to any of the foregoing or any breach of this Agreement by You, pending Google's reasonable investigation of any of the foregoing or any breach of this Agreement by You . . . ."); Exhibit B, ¶ 10 ("If we terminate the Agreement due to your breach or due to invalid activity, we may withhold unpaid amounts or

charge back your account."); *see also* Exhibit "B", ¶ 5; Exhibit "B" ¶ 5 ("Payments to [publishers] may be withheld to reflect or adjusted to exclude any amounts refunded or credited to advertisers and any amounts arising from invalid activity . . . ."). But not all liquidated damages provisions are enforceable.

38. Law of California provides that "a provision in a contract liquidating the damages for the breach of the contract is valid *unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made*." CAL. CIV. CODE § 1671(b). Here, for the reasons expressed in this complaint, the provisions at issue were "unreasonable" under paragraph 5 of its AdSense terms and conditions in order to withhold 100% of unpaid program earnings from publisher lie plaintiffs upon termination of its action, such that it, too, would be viewed as a liquidated damages provision. The circumstances existing at the time the contract was made." *See* CAL. CIV. CODE § 1671(b). Accordingly, the provisions are invalid and unenforceable and designed to harm the plaintiffs.

39. Further that this agreement was not ratified by the advertisers but the plaintiffs' predecessor-in-interest's webmaster.

40. Due to unreasonableness, invalidity, and unenforceability of these liquidated damages provisions, and no consent by the advertisers receiving refund, plaintiffs are entitled the monetary, restitutionary, declaratory, injunctive, and other relief requested herein, including but not limited to the payment to them of all funds wrongfully withheld from them by the Google pursuant to these provisions.

## AS AND FOR SECOND CAUSE OF ACTION
### (BREACH OF CONTRACT)

41.     Plaintiffs repeat and reiterate each and every allegation contained in paragraph #

1 through # 40 of the complaint and  incorporate by reference the allegations in the above

paragraphs as if fully set forth herein.

42.     Plaintiffs' predecessor in interest entered into the contract with Google for

participation in Google's AdSense program (*See* Exhibit "B" and "B-1").  At that time certain

terms that the terms alleged in agreements are to be valid and enforceable.  At that time nothing

was waived.

**A. Google has breached the parties' contracts, entitling plaintiffs to damages for their performance thereunder.**

43.     At issue the AdSense contracts contain promising terms that Google will pay

publishers for, *inter alia*, serving ads on their websites sold by Google to various advertisers.

(Exhibit , ¶ 5;) As alleged herein, plaintiffs' predecessor in interest has performed under the

AdSense contract by, *inter alia*, adhering to all of Google's contract terms and applicable

policies, and by displaying the subject ads on its websites and other properties.

44.     Google is relying on other terms of the contracts, terminated plaintiffs'

predecessor in interest account allegedly posing a significant risk to GOOGLE's AdWords

advertisers while determining on an administrative appeal based on self-serving and an erroneous

allegations that "accounts disabled for invalid click activity will receive no further payment nor

any reissue of previous payment. Your outstanding balance and Google's share of the revenue

will both be fully refunded back to the affected advertisers."

45.     That the foregoing contradictory and inconsistent reason given no meaningful

reason for doing so, thereby breaching the parties' contract which permits termination of

18

publisher's account only for some reason. (*See* Exhibit. B-1, ¶ 10 ("Google may at any time terminate the Agreement . . . for any *reason*.") (emphasis added); Exhibit. B-1, ¶ 11 (containing "for any reason" provision). However, Plaintiffs' predecessor in interest has performed all material or significant respects under its contract with Google, or being Exhibit therefrom, gave Google no reason to terminate its contract. This is illustrated, in part, by Google allowing other publishers to continue serving AdSense ads on sites similar to those on which plaintiffs served AdSense ads.

46.     Google also has breached the parties' contract by uniformly and systematically withholding all funds due to plaintiff's as publisher at the time of termination without the application of the discretion promised in the contract. (*See* Exhibit "B", ¶ 5 ("Payments to you *may* be withheld to reflect or adjusted to Exhibit any amounts refunded or credited to advertisers and any amounts arising from invalid activity, as determined by Google in its sole *discretion*.") (emphasis added), ¶ 10 ("If we terminate the Agreement due to your breach or due to invalid activity, we *may* [not *will*] withhold unpaid amounts or charge back your account.") (emphasis added); Exhibit "B", ¶ 5, Exhibit "B-1" 10. Regardless of whether, for Exhibit sample, 1% of the ads or 60% of the ads served in the subject time period may, in Google's view, have been associated with what Google deems invalid activity or policy violations, Google, as an admitted matter of extra-contractual policy, systematically withholds 100% of the money at issue from all terminated publisher. Google takes this action notwithstanding its acknowledged ability to determine which ads may, in its view, have been associated with what it deems invalid activity, and which ads were not. Moreover, Google takes this action even if the publisher GIMMEGELT itself was not the cause of, and had nothing to do with, the supposed violation of Google policy

leading to disablement of its account. Whatever the circumstances, Google systematically withholds all program funds earned by publisher upon its termination accusing it.

47. As alleged above, plaintiffs' predecessor in interest has performed its duties under the contract at issue by doing all, or substantially all, of the significant or material things the contract required it to do, or it was Excused from having to do those things. This has given rise to Google's duty to perform by paying plaintiffs' predecessor in interest all the earnings due them.

48. Furthermore, where conditions precedent to Google's performance (*i.e.*, paying AdSense publisher its earnings) are concerned, Google's conduct in the above regard, including the systematic withholding of 100% of program earnings upon termination of plaintiffs' predecessor in interest publisher account, was arbitrary, capricious, and unreasonable in that a uniform and complete withholding was effected, whatever the circumstances. In light of Google's admitted ability to segregate what it deemed invalid activity or breaching activity from non-problematic activity, and in light of the widely varying and often large amounts of ad serves and earned money at stake, and other factors alleged herein, Google's behavior was not reasonable by any objective standard.

49. Alternatively, where conditions precedent to Google's performance (*i.e.*, paying AdSense publisher its earnings) was concerned, Google's conduct in the above regard, including the systematic withholding of 100% of program earnings upon termination of plaintiffs' predecessor in interest publisher's account, was done in bad faith. Neither the decision to withhold 100% of plaintiffs' unpaid program earnings, nor the act of withholding those funds, were done in good faith. Instead, they were simply Examples of Google's systematic and uniform policies and practice to withhold the publisher's last earnings completely.

20

50.   Plaintiffs have been damaged by Google's breaches of contract. Google owes the plaintiffs for their program earnings to the full extent allowed by the parties' contracts, together with prejudgment interest.

**B.** The contracts contain unconscionable terms that are unenforceable.

51.   Further, the contractual terms purporting to permit Google to withhold payment of funds owed to plaintiff's predecessor in interest as publisher whose account it disabled, which Google reads and applies as permitting it to withhold such funds in their entirety, are unconscionable. Accordingly, they are unenforceable. *See* CAL. CIV. CODE § 1670.5(a).

52   These oppressive terms appear in contract of adhesion that were foisted upon small entity and its individual shareholder and officers, which had no bargaining power, by a giant and powerful corporation, Google, that drafted them and presented them as a take-it-or-leave-it proposition. There was no negotiation, and there was an absence of meaningful choice. Therefore, the identified terms are procedurally unconscionable.

53.   Also, the terms at issue are so one-sided as to shock the conscience; they are harsh and oppressive in that they purport, according to Google, to allow Google to withhold all program funds corresponding to ads placed on the publisher's properties, however limited in scope or time the supposed offense or policy violation might have been, and even when the publisher had nothing to do with whatever Google deems to be cause for termination of plaintiffs account. Google applies these terms to withhold plaintiffs' $184,503.42 representing unpaid earnings from February, 2012 to May 27, 2012 (February $28.29 + March 2012 $3,304.29 + April 2012 $83,758.56 + May 2012 $91,848.43 = $184,503.42), from terminated publisher for earnings periods well in excess of a month, under the circumstances of this case. Therefore, the identified terms are substantively unconscionable. Thus, being both procedurally and

substantively unconscionable, these terms are unenforceable under CAL. CIV. CODE § 1670.5(a).

C. The parties' contract contains invalid and unenforceable liquidated damages provisions.

54.     Additionally, these terms constitute unreasonable, invalid, and unenforceable provisions for liquidated damages, for the reasons set forth herein, including specifically as set forth in this complaint and under CAL. CIV. CODE § 1671(b). When Google disabled this publisher's account, it withholds all funds associated with the publisher account. These are its liquidated damages for purported violations of its terms of service. But under California law governing liquidated damages provisions, the terms in question constitute penalties in that the sums Google can purportedly withhold from publishers, *i.e.*, *all* sums at issue bear no reasonable relationship to any actual damages or injury that Google might have suffered from the supposed breach of the AdSense contracts by publishers. Indeed, Google's purported contractual right to withhold all such funds bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach of Google's AdSense terms of service or though Googles' possible claims that an argument to the effect that these terms, in its own view, allow it to withhold 100% of funds even if one out of 500 clicks are supposedly invalid or problematic in some way, Google in fact withholds 100% of unpaid program earnings from this terminated publisher, and gives plaintiffs virtually no reason as to why. A reasonable inference may flow that Google in fact withholds 100% of funds under these terms even when it can identify few clicks or ad serves as problematic policies. Setting liquidated damages at 100% of the total sum at issue does not represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that might be sustained, for in fact, there was no such endeavor at all. No matter how limited the supposed offense, Google refuses to pay all

the funds owed by the plaintiffs' predecessor in interest, notwithstanding all the performance on the part of the plaintiffs' publisher in the payment period prior to Google's disabling of its account. California law does not permit Google so to do, including under the law of severable, paired performances, part performance, or restitution, for the law abhors forfeiture. In short, Google's liquidated damages provisions were unreasonable under the circumstances existing at the time the contract was made, rendering them invalid and unenforceable under California law.. And California law does not otherwise permit Google to withhold all unpaid amounts from the plaintiffs as publisher when it terminates them for purported breach of contract.

**D. When the unenforceable provisions are stricken from the contract, plaintiffs are left with recoverable damages for their performance under the contracts.**

55.    With these payment-withholding terms stricken from the contracts as unenforceable, Google's liability to plaintiffs for breach of contract is stark. As alleged above, plaintiffs' predecessor in interest has performed its duties under the contracts by doing all, or substantially all, of the significant or material things the contracts required it to do, or it was excused from having to do those things. This has given rise to Google's duty to perform by paying plaintiffs all the earnings due them as assignee of the publisher GIMMEGELT, INC.

56.    Plaintiffs have been damaged by Google's breach of contract in the amount of sums payable to their assignor but withheld when its AdSense account was disabled, and appeal denied together with pre-judgment interest.

**E. Accounting**

57.    As additional relief or as part of their remedy, plaintiffs are entitled to an accounting of all AdSense program sums earned, payable, or otherwise associated with their

predecessor in interest' publisher account at the time it was disabled, including without limitation as to all sums associated with the publisher's service of AdSense-related ads on their websites or other properties, or other performance under any AdSense program, and any subset of such sums that Google purports to be associated with the claimed violation of AdSense terms of service or policies.

58.     Such an accounting will enable a determination of the amount of damages owed to plaintiffs, especially in these circumstances where Google locked out plaintiffs predecessor in interest as publisher from its account upon termination; where the plaintiffs' predecessor in interest has relationship with Google based on Google's collection and administration of funds owed to it; and where Google is the party that knows what supposed violations or invalid activities it had in mind when it terminated plaintiff's predecessor in interest's account as publisher, and to what Exhibit these violations or activities correspond to ads served and other performance on the part of the plaintiffs' predecessor in interest.


## AS AND FOR A THIRD CAUSE OF ACTION
## (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
## AND FAIR DEALING)

59.     Plaintiffs repeat and reiterate each and every allegation contained in paragraph # 1 through # 58 of the complaint and  incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

60.     Plaintiffs' predecessor in interest GIMMEGELT, INC., entered into a contract with Google regarding its participation in Google's AdSense program. (*See* Exhibits "B" and "B-1" attached hereto). That certain terms alleged in this complaint are to be invalid based on the grounds as alleged and unenforceable, and other terms in this contract are valid.

61.    As alleged above, plaintiffs' predecessor in interest  has performed its duties under the contract by doing all, or substantially all, of the significant or material things the contract required it to do, or it was excused from having to do those things. This has given rise to Google's duty to perform by paying it all the earnings due to it.

62.    There Exhibit exists in every contract, including Google's AdSense agreement with the plaintiffs' predecessor in interest, an implied covenant of good faith and fair dealing. Google has breached this covenant by unfairly interfering with plaintiffs' right to receive the benefits of the contract at issue.

63.    First, Google terminated plaintiffs' predecessor in interest's account and offered no meaningful reasons for doing so, thereby breaching the parties' contract which permits termination of publisher's accounts only for some reason. (*See* Exhibit "B", ¶ 10 ("Google may at any time terminate the Agreement . . .*for any reason*.") (emphasis added). By a provision in ¶ 11, Exhibit "B-1", the defendant Google promised reasonable investigation. Further, Google purported to terminate plaintiffs' predecessor in interest GIMMEGELT, INC.,'s AdSense account for supposed "posing a significant risk to our [Google's] Adwords advertisers." even though plaintiffs' predecessor in interest endeavored at all times to comply with Google's terms and policies and to resolve them to Google's satisfaction. (See email dated May 27, 2012 attached hereto as Exhibit "D"). Then, as a matter of extra-contractual policy, Google denied plaintiffs' predecessor in interest's GIMMEGELT, INC.'s meaningful investigation and information request regarding Google's claim of "posing a significant risk to our [Google's] Adwords advertisers."    Defendant GOOGLE refused GIMMEGELT, INC.'s sincere and reasonable request for details. Because of this behavior, plaintiffs' predecessor in interest, GIMMEGELT, INC., could make no meaningful appeal. Nonetheless, plaintiffs' predecessor in

interest, GIMMEGELT, INC. attempted to appeal through its senior technology consultant, advising Google that GIMMGLET, INC., do not know what the defendant GOOGLE mean by posing a significant risk to our [Google's] Adwords advertisers." The plaintiffs' predecessor in interest, GIMMEGELT, INC. filed an appeal with GOOGLE but Google simply denied the plaintiffs' predecessor in interest, GIMMEGELT, INC., request, without any good-faith review and advised on May 31, 2012 via an email that:

> " Thank you for your appeal. We appreciate the additional
>
> information you've provided, as well as your continued interest in the
>
> AdSense program.
>
> However, after thoroughly re-reviewing your account data and taking
>
> your feedback into consideration, our specialists have confirmed that
>
> we're unable to reinstate your AdSense account.
>
> Please know that, once we've reached a decision on your appeal,
>
> further appeals may not be considered, and you might not receive any
>
> further communication from us. Note that AdSense publishers whose
>
> accounts are disabled for violations of our Terms and Conditions are
>
> not eligible for further participation in AdSense.  For this reason, you
>
> may not open new accounts.
>
> Also, accounts disabled for invalid click activity will receive no
>
> further payment nor any reissue of previous payment. Your
>
> outstanding balance and Google's share of the revenue will both be
>
> fully refunded back to the affected advertisers.
>
> Thank you for your understanding in this matter.

We understand that you may want more information about your

account activity. However, because we have a need to protect our

proprietary detection systems, we're unable to provide our publishers

with any details about their account activity.

Sincerely,

The Google AdSense Team"

(See The Google AdSense Team's Decision on Appeal dated May 31, 2012

attached hereto as Exhibit "E").

64. Second, Google violated the covenant by withholding *all* sums payable to the

plaintiffs' predecessor in interest, GIMMEGELT, INC., for ads already served on their websites

during the period preceding termination of its account, purporting to return these funds to

advertisers. Google made no effort whatsoever to limit the funds it refused to pay to the

plaintiffs' predecessor in interest, GIMMEGELT, INC., in any way—even though the contract

promises the use of discretion and said only that funds *might* be withheld (not that they *would* be

withheld). (*See* Exhibit "B", ¶ 5 ("Payments to you *may* be withheld to reflect or adjusted to

exclude any amounts refunded or credited to advertisers and any amounts arising from

invalid activity, as determined by Google in its sole *discretion.*") (emphasis added), ¶ 10 ("If we

terminate the Agreement due to your breach or due to invalid activity, we *may* [not *will*]

withhold unpaid amounts or charge back your account.") (emphasis added). For example,

Google did not limit the funds it withheld to ads appearing on specific webpages, nor did it limit

its action to a specific time period when activity that purportedly violated its policies had

occurred. Instead, as a matter of its extra-contractual policy, Google systematically withheld

100% of plaintiffs' predecessor in interest, GIMMEGELT, INC.'s program earnings for the

27

periods preceding its termination. Upon information and belief, by reason of the foregoing, the plaintiffs as successor in interest to GIMMEGELT, INC., have suffered damages by reason of the violations of the covenant.

65.     Where discretion, or absolute discretion, is given under the contract to Google, Exhibit "B", ¶¶ 5, 10, Google may claim that it did merely what the contract said it could do under its grant of that discretion; therefore, according to Google, the implied covenant of good faith and fair dealing cannot apply because it would be at odds with the contract's express grant of discretionary power or absolute discretion. Here, however, the covenant of good faith and fair dealing must be implied with respect to Google's discretion, or absolute discretion, because otherwise, if the provisions at issue were read literally, then an unenforceable, illusionary agreement would result given that plaintiffs' predecessor in interest, GIMMEGELT, INC., as publisher received no money or other consideration from Google beyond what would be an illusory promise of payment.

66.     Plaintiffs have been damaged by Google's breach of the implied covenant of good faith and fair dealing in the amount of sums owed to them but not paid when their predecessor in interest, GIMMEGELT, INC., AdSense accounts was disabled based on the purported allegation that its account was "posing a significant risk to our [Google's] Adwords advertisers.", and later on in a determination on administrative appeal, dated May 31, 2012, conveniently  advising "accounts disabled for invalid click activity will receive no further payment nor any reissue of previous payment. Your outstanding balance and Google's share of the revenue will both be fully refunded back to the affected advertisers," together with pre-judgment interest.

67.     As additional relief or as part of their remedy under this alternative claim, plaintiffs are entitled to an accounting of all AdSense program sums earned by the plaintiffs'

predecessor in interest, GIMMEGELT, INC., payable, or otherwise associated with its publisher account at the time it was disabled, including without limitation as to all sums associated with the publisher's service of AdSense-related ads on its websites or other properties, or other performance under any AdSense program, and any subset of such sums that Google purports to be associated with the claimed violation of AdSense terms of service or policies.

68.     Such an accounting will enable a determination of the amount of damages owed to plaintiffs' predecessor in interest, GIMMEGELT, INC., especially in these circumstances where Google locked out the plaintiffs' predecessor in interest, GIMMEGELT, INC., as publisher from its account upon termination; where the plaintiffs' predecessor in interest, GIMMEGELT, INC., has relationship with Google based on Google's collection and administration of funds owed to it; and where Google is the party that knows what supposed violations or invalid activities or GIMMEGELT, INC., as publisher "posing a significant risk to our [Google's] Adwords advertisers." it had in mind when it terminated plaintiffs' predecessor in interest, GIMMEGELT, INC., publisher's account, and to what extent these violations or activities correspond to ads served and other performance on the part of the plaintiffs' predecessor in interest, GIMMEGELT, INC.

## FOURTH CAUSE OF ACTION
### (UNJUST ENRICHMENT)

69.     Plaintiffs repeat and reiterate each and every allegation contained in paragraph # 1 through # 68 of the complaint and   incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

69.     Plaintiffs plead this cause of action in the alternative to their causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing. Plaintiffs

have alleged that certain terms of the contract addressing the withholding of program earnings from terminated publisher, plaintiffs' predecessor in interest, GIMMEGELT, INC., are invalid and unenforceable. Plaintiffs plead this claim to the extent necessary to provide them a means of recovering program earnings due them if the terms at issue are held to be unenforceable. For purposes of this cause of action, plaintiffs deny the enforceability of the terms at issue, and, as needed to enable the recovery of the earnings due them for serving AdSense program ads, the unenforceability of their entire AdSense contracts with Google.

70.    To the detriment of plaintiffs, Google has been and continues to be unjustly enriched as a result of the unlawful and/or wrongful conduct alleged herein. More specifically, Google has been unjustly benefited by retaining monies due and payable to publisher, plaintiffs' predecessor in interest, GIMMEGELT, INC., for serving on its websites advertisements sold by Google to various advertisers.

71.    As between the plaintiffs on one hand, and Google on the other, it would be unjust for Google to retain the benefits attained by its wrongful actions. Moreover, even if Google remitted some or all of the withheld funds to its advertisers, it did so by its wrongful choice, to the publisher's GIMMEGELT, INC., plaintiffs' predecessor in interest, detriment, after first wrongfully choosing to withhold all of the sums payable to plaintiffs' predecessor in interest, GIMMEGELT, INC., as publisher when it terminated its account based on alleged allegation that GIMMEGELT, INC., as publisher, is "posing a significant risk to our [Google's] Adwords advertisers." and later on in a determination on administrative appeal, dated May 31, 2012, conveniently advising "accounts disabled for invalid click activity will receive no further payment nor any reissue of previous payment. Your outstanding balance and Google's share of the revenue will both be fully refunded back to the affected advertisers," together with pre-

judgment interest. Thus, Google remains liable to plaintiffs for these funds. Accordingly, under this alternative cause of action, should plaintiffs ultimately rely upon it, plaintiffs seek full restitution of the referenced sums which Google withheld from them and by which Google was unjustly enriched, together with pre-judgment interest, or the value of the benefit by which Google was unjustly enriched, based on the wrongful conduct alleged herein.

72. As additional relief or as part of their remedy under this alternative claim, plaintiffs are entitled to an accounting of all AdSense program sums earned, payable, or otherwise associated with plaintiffs' predecessor in interest, GIMMEGELT, INC., publisher account at the time it was disabled, including without limitation as to all sums associated with the plaintiffs' predecessor in interest, GIMMEGELT, INC., as publisher service of AdSense-related ads on its websites or other properties, or other performance under any AdSense program, and any subset of such sums that Google purports to be associated with the claimed violation of AdSense terms of service or policies.

73. Such an accounting will enable a determination of the amount of damages owed to plaintiffs, especially in these circumstances where Google locked out plaintiffs' predecessor in interest, GIMMEGELT, INC., as publisher from its account upon termination; where the plaintiffs as successor in interest to GIMMEGELT, INC., have relationships with Google based on Google's collection and administration of funds owed to them; and where Google is the party that knows what supposed violations or invalid activities it had in mind when it terminated plaintiffs' predecessor in interest, GIMMEGELT, INC.'s account for "posing a significant risk to our [Google's] Adwords advertisers." and later on in a determination on administrative appeal, dated May 31, 2012, conveniently advising "accounts disabled for invalid click activity will receive no further payment nor any reissue of previous payment. Your outstanding balance and

31

Google's share of the revenue will both be fully refunded back to the affected advertisers," and to what extent these violations or activities correspond to ads served and other performance on the part of the plaintiffs' predecessor in interest, GIMMEGELT, INC., or plaintiffs' predecessor in interest allegedly "posing a significant risk to our [Google's] Adwords advertisers." was not caused by the plaintiffs' predecessor in interest but due to new technology developed during that time while GOOGLE may have allegedly implemented systems to identify and reduce fraudulent and invalid clicks, based on the new technology developed by its competitor blocking GOOGLE's advertising and an increase in refunds negatively affected GOOGLE's profitability and damages to its brand, leading to the not refunding or returning any revenue to its advertiser and systematically cutting off and disabling the hard working publishers like the plaintiff who brought traffic to GOOGLE and its network websites so that there would be more profit to GOOGLE and its network publisher like the plaintiffs as successor in interest to GIMMEGELT, INC.   Further, the sum of money charged by the defendant GOOGLE to the advertisers for the traffic generated by the plaintiff's websites and then not paying to the plaintiff's predecessor in interest for this legitimate traffic is illegitimate and improper and must be given to the plaintiffs. These amounts of money constitutes money which, in equity in good conscience, should be given by the defendants GOOGLE to the plaintiffs pursuant to an equitable doctrine of restitution and/or unjust enrichment since the money had and received because such money was collected in violation of applicable law.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**VIOLATION OF THE UNFAIR COMPETITION LAW**
**(CAL. BUS. &PROF. CODE §§ 17200, et seq.)**

74.     Plaintiffs repeat and reiterate each and every allegation contained in paragraph #1 through #73 of the complaint and  incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

75.     Plaintiffs bring this claim under California's Unfair Competition Law.

76.     California's Unfair Competition Law ("UCL") defines unfair competition to include any "unlawful, unfair, or fraudulent" business act or practice. CAL. BUS. & PROF. CODE §§ 17200, *et seq.*

77.     Google has engaged in, and, upon information and belief, continues to engage in, fraudulent, unlawful, and unfair business acts and practices prohibited by California's UCL. These acts and practices, which were undertaken in California, include the inducing of AdSense publisher like plaintiffs' predecessor in interest, GIMMEGELT, INC., to serve ads on its websites for Google advertisers on the promise of payment to the plaintiffs' predecessor in interest, GIMMEGELT, INC., as publisher of a share of the money paid to Google by the advertisers for that service; causing plaintiffs' predecessor in interest, GIMMEGELT, INC., as publisher to serve those ads on its websites; then disabling the plaintiffs' predecessor in interest, GIMMEGELT, INC., account as publisher before monies earned for serving those ads is due to be paid upon the grounds that allegedly plaintiffs' predecessor in interest was "posing a significant risk to our [Google's] Adwords advertisers." and later on in a determination on administrative appeal, dated May 31, 2012, conveniently advising plaintiffs predecessor in interest that "accounts disabled for invalid click activity will receive no further payment nor any reissue of previous payment. Your outstanding balance and Google's share of the revenue will both be fully refunded back to the affected advertisers,"; maintaining an extra-contractual policy providing that all final program earnings would be withheld systematically and uniformly from

33

the plaintiffs' predecessor in interest, GIMMEGELT, INC., as publisher whose account was disabled, without the use of any discretion whatsoever, notwithstanding promises to the contrary in Google's contract; and then systematically and uniformly withholding not some, but *all*, of the funds due to the plaintiffs' predecessor in interest, GIMMEGELT, INC., as publisher for serving ads or otherwise performing during the final payment periods, without any attempt to limit, let alone rationally limit, the sum withheld, and without the application of discretion or good faith. These acts and practices broadly and detrimentally affected  the plaintiffs as publisher and consumer of Google's AdSense products; in addition, the plaintiffs predecessor in interest, GIMMEGELT, INC., as publisher is a small and unsophisticated entity, or individuals, who have fallen prey to the conduct of a much larger and sophisticated entity as set forth herein.

78.     Google's conduct has harmed plaintiffs. Google advertises its AdSense program widely, and the plaintiffs' predecessor in interest, GIMMEGELT, INC., a small publisher, became customer of the service, or product, it offers. Despite plaintiffs' predecessor in interest, GIMMEGELT, INC.'s actions as publisher, including those to comply with Google's policies and to act in good faith in response to any notices from Google of policy infringements, Google refuses to pay plaintiffs' predecessor in interest, GIMMEGELT, INC., as publisher, what is owed it for serving ads during the period prior to disabling its account. As a matter of a policy and practice outside the parties' contracts, Google simply withholds all the monies due to terminated publisher, plaintiffs' predecessor in interest, GIMMEGELT, INC., herein, first upon the grounds that "posing a significant risk to our [Google's] Adwords advertisers." and later on in a determination on administrative appeal, dated May 31, 2012, conveniently advising plaintiffs predecessor in interest that "accounts disabled for invalid click activity will receive no further payment nor any reissue of previous payment. Your outstanding balance and Google's share of

the revenue will both be fully refunded back to the affected advertisers,"; however limited in scope or time a purported policy violation or purported contract breach (including purported breaches which, if they actually occurred, were not material breaches), or plaintiffs' predecessor in interest, GIMMEGELT, INC.'s as publisher's supposed offense, may be.

## A. Violation of "Fraudulent" Prong of UCL

79. First, Google's behavior violates the "fraudulent business act or practice" prong of the UCL. Nowhere do Google's AdSense contract with the plaintiffs' predecessor in interest, GIMMEGELT, INC., as publisher advised plaintiffs, of its policy that upon termination of the plaintiffs' predecessor in interest, GIMMEGELT, INC.'s account as publisher, it *will* withhold 100% of the publisher's unpaid program earnings for the period, however long, prior to termination.

80. Google's AdSense contracts with plaintiffs' predecessor in interest, GIMMEGELT, INC., as publisher, (*see* Exhibit "B" and "B-1" attached hereto) does *not* provide or advise that, as a matter of policy or course, upon termination of the plaintiffs' predecessor in interest, GIMMEGELT, INC., publisher account, Google will automatically withhold 100% of the plaintiffs' predecessor in interest, GIMMEGELT, INC.'s publisher's unpaid program earnings. To the contrary, the contract speak in terms of an application of (a) *discretion* to decisions to withhold or adjust payments; and (b) advise only that Google *may*—not *will*— withhold unpaid accounts, ("Google reserves the right to withhold payment or charge back Your account due to any of the foregoing or any breach of this Agreement by You, pending Google's reasonable investigation of any of the foregoing or any breach of this Agreement by You . . . ."). Plaintiffs' predecessor in interest, GIMMEGELT, INC., did reviewed the contract prior to it

becoming AdSense publisher. However, it did not waive any rights. The form of AdSense contract attached as Exhibit "B" and "B-1" to this complaint, which is dated February 25, 2008, appears, based on an examination of the SEC website www.sec.gov and Internet Archives (https://archive.org/indExhibit.php) files, to have been in effect at least through early April, 2013.

81.    Had the information regarding withholding the 100% of the unpaid earned income been disclosed to the Plaintiffs' predecessor in interest, GIMMEGELT, INC., it would have behaved differently; plaintiffs would not have expended time, energy, and money in its websites serving AdSense program ads if it had known that Google would always withhold 100% of their unpaid program earnings if it terminated their accounts, and omitting to advise plaintiffs in its contract of critical information as to its extra-contractual 100%-withholding policy, Google has violated the "fraudulent" prong of the UCL. nowhere indicated that Google would always withhold 100% of a publisher' final program earnings at termination of its account.

B. Violation of "Unlawful" Prong of UCL

82.    Second, Google withholds 100% of unpaid program funds from plaintiffs' predecessor in interest, GIMMEGELT, INC., as terminated publisher, on the basis of contractual terms purportedly permitting such conduct, but which actually violate California law (a) making unlawful and unenforceable contractual terms that are unconscionable; and (b) rendering unlawful and unenforceable unreasonable and penalizing provisions for liquidated damages. *See* CAL. CIV. CODE § 1670.5(a); CAL. CIV. CODE § 1671(b). Additionally, by willfully and intentionally omitting critical information from plaintiffs' predecessor in interest, GIMMEGELT, INC., in its program contracts regarding its policy of withholding 100% of

unpaid program funds upon account termination, Google has violated CAL. CIV. CODE § 1709, which makes deceit unlawful. *See also* CAL. CIV. CODE § 1710 ("A deceit, within the meaning of the last section, is either: . . . (2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; (3) The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or, (4) A promise, made without any intention of performing it."). Having violated these provisions of California law, Google has violated the "unlawful" prong of the UCL.

## C. Violation of "Unfair" Prong of UCL

83.    Third, Google's actions, including conduct based on unconscionable contract terms and deceit, are patently unfair. As described above, Google systematically withholds all monies due to plaintiffs' predecessor in interest, GIMMEGELT, INC., as publisher for performance already rendered when Google terminates the plaintiffs' predecessor in interest, GIMMEGELT, INC.'s account as publisher upon the grounds that it is "posing a significant risk to our [Google's] Adwords advertisers." and later on in a determination on administrative appeal, dated May 31, 2012, conveniently advising plaintiffs predecessor in interest that "accounts disabled for invalid click activity will receive no further payment nor any reissue of previous payment. Your outstanding balance and Google's share of the revenue will both be fully refunded back to the affected advertisers,"; no matter how limited in scope or time the supposed offense identified by Google that led to termination. This practice is tied to Google's violation of the law as to liquidated damages provisions, CAL. CIV. CODE § 1671(b), rendering it patently unfair as a systematic penalty applied to the terminated publisher, GIMMEGELT, INC., plaintiffs'

predecessor in interest. The harm that Google causes by wielding its unlawful liquidated damages provision like a sledgehammer is not balanced by any good it does, especially where it already has terminated the plaintiffs' predecessor in interest as publisher and has the means to identify what it considers to be problematic ad serves and to adjust accounts accordingly, which it does on a regular basis. It need not withhold 100% of all unpaid program earnings. Where Google has no liability over to advertisers, there is no justification for the harm it causes to plaintiffs' predecessor in interest, GIMMEGELT, INC., as terminated publisher by penalizing it for all earned but unpaid revenue. It is unfair to kick this publisher when Google already has shut off its participation in the program, upon which plaintiffs depend for their livelihoods.

84.     Also, Google has engaged in deceit by not advising plaintiffs' predecessor in interest, GIMMEGELT, INC., as publisher in its contract of this policy and practice. This, too, is unfair and unjustified under the attendant circumstances.

85.     Thus, Google's fraudulent, unlawful, and unfair business acts and practices as described herein demonstrate and constitute unfair competition in violation of California's UCL. *See* CAL. CIV. CODE § 17200 ("[U]unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice . . . ."). These acts and practices also detrimentally affect the public interest, in that they undermine the lawfulness and fairness of business practices in California, and outside California under contracts mandating the application of California law, among the publisher like Plaintiffs' predecessor in interest, GIMMEGELT, INC., to whom Google broadly advertises and makes its AdSense program, and contract, available affecting Plaintiffs' predecessor in interest, GIMMEGELT, INC.

86.     Under the UCL, plaintiffs as successor in interest to GIMMEGELT, INC., are entitled to restitution of the monies owed them for their performance under the AdSense

program, but retained by Google wrongfully, together with pre-judgment interest, and that under the UCL, *see* CAL. CIV. CODE § 17203, plaintiffs are entitled to an accounting of all AdSense program sums earned, payable, or associated with its publisher account at the time it was disabled, including without limitation as to all sums associated with the plaintiffs' predecessor in interest, GIMMEGELT, INC., as publisher service of AdSense-related ads on its websites or other properties, or other performance under any AdSense program, and any subset of such sums that Google purports to be associated with the claimed violation of AdSense terms of service or policies. Such an accounting will enable a determination of the amount of restitution owed to plaintiffs, especially in these circumstances where Google locks out publishers from their accounts upon termination; where the Plaintiffs' predecessor in interest, GIMMEGELT, INC., has with Google based on Google's collection and administration of funds owed to it; and where Google is the party that knows what supposed violations or plaintiffs predecessor in interest was "posing a significant risk to our [Google's] Adwords advertisers." or invalid activities it had in mind when it terminated Plaintiffs' predecessor in interest, GIMMEGELT, INC., account as publisher, and to what extent these violations or activities correspond to ads served and other performance on the part of the plaintiffs' predecessor in interest, GIMMEGELT, INC.

## SIXTH CAUSE OF ACTION
## REQUEST FOR DECLARATORY RELIEF
## (CALIFORNIA DECLARATORY JUDGMENT ACT, CAL. CIV. PROC. CODE § 1060)

87.     Plaintiffs repeat and reiterate each and every allegation contained in paragraph # 1 through # 86 of the complaint and  incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

88.     For the reasons set forth in the preceeding paragraphs , the contractual terms purporting to permit Google to withhold payment of earned but unpaid program revenues owed

to Plaintiffs' predecessor in interest, GIMMEGELT, INC., as publisher whose account it disabled, which Google reads and applies as permitting it to withhold such unpaid amounts in their entirety, are unconscionable. Accordingly, they are unenforceable. *See* CAL. CIV. CODE § 1670.5(a) ("If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."). Yet Google purports to rely on these terms in withholding funds from plaintiffs' predecessor in interest, GIMMEGELT, INC., as AdSense publisher; accordingly, there is an actual controversy between the plaintiffs, as successor in interest to GIMMEGELT, INC., publisher on the one hand, and Google on the other.

89.     Also, for the reasons set forth in this complaint, Google's contractual terms invoked by it to withhold from terminated publishers all "unpaid amounts," *i.e.*, earned but unpaid program revenue, or earnings; or to withhold from plaintiffs' predecessor in interest, GIMMEGELT, INC., as terminated publisher all "payments", constitute unreasonable, invalid, and, therefore, unenforceable liquidated damages provisions. Further, to the extent that Google relies upon paragraph 5 of the Contract (Exhibit "B") (or any other provision) of its terms and conditions (Exhibit "B") as giving it the right to withhold all earned but unpaid amounts from Plaintiffs' predecessor in interest, GIMMEGELT, INC., as a terminated publisher, that term, too constitutes an unreasonable, invalid, and, therefore, unenforceable liquidated damages provision. CAL. CIV. CODE § 1671(b) ("except as provided in subdivision (c), a provision in a contract liquidating the damages for the breach of the contract is valid *unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances*

*existing at the time the contract was made.*") (emphasis added). Yet Google purports to rely on these terms in withholding funds from the plaintiffs' predecessor in interest, GIMMEGELT, INC., as AdSense publisher; accordingly, there is an actual controversy between the plaintiffs on the one hand, and Google on the other.

90.     Accordingly, per the foregoing, including for those reasons expressed in this complaint specifically referenced and thereby incorporated in this cause of action, plaintiffs, pursuant to CIV. PROC. CODE § 1060 and otherwise, are entitled to an order or orders declaring these terms: (a) unconscionable, and, therefore, unenforceable against plaintiffs as AdSense publisher pursuant to CAL. CIV. CODE § 1670.5(a); and (b) unreasonable liquidated damages provisions that are invalid pursuant to CAL. CIV. CODE § 1671(b), and, therefore, unenforceable as against them as ADSense publisher.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## (FEDERAL DECLARATORY JUDGMENT ACT 28 U.S.C. § 2201.(a))

91.     Plaintiffs repeat and reiterate each and every allegation contained in paragraph # 1 through # 91 of the complaint and  incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

92.     For the reasons set forth in this complaint, the contractual terms purporting to permit Google to withhold payment of earned but unpaid program revenues owed to plaintiffs' predecessor in interest, GIMMEGELT, INC., as publisher whose accounts it disables, (*see* Exhibit "B" and "B-1"), which Google reads and applies as permitting it to withhold such unpaid amounts in their entirety, are unconscionable. Accordingly, they are unenforceable. *See* CAL. CIV. CODE § 1670.5(a) ("If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it

may so limit the application of any unconscionable clause as to avoid any unconscionable result."). Yet Google purports to rely on these terms in withholding funds from AdSense publishers; accordingly, there is an actual controversy between the plaintiffs and on the one hand and Google on the other.

93.     Also, for the reasons set forth above in this complaint, Google's contractual terms invoked by it to withhold from terminated publisher like the Plaintiffs' predecessor in interest, GIMMEGELT, INC.,  and all "unpaid amounts," *i.e.*, earned but unpaid program revenue, or earnings; or to withhold from plaintiffs' predecessor in interest, GIMMEGELT, INC., account as terminated publisher all "payments" constitute unreasonable, invalid, and, therefore, unenforceable liquidated damages provisions. Further, to the extent that Google may rely upon paragraph 5 of the contract (or any other provision) of its terms and conditions (Exhibit "B") as giving it the right to withhold all earned but unpaid amounts from terminated publisher, like plaintiffs' predecessor in interest, GIMMEGELT, INC., that term, too, constitutes an unreasonable, invalid, and, therefore, unenforceable liquidated damages provision. CAL. CIV. CODE § 1671(b) ("Except as provided in subdivision (c), a provision in a contract liquidating the damages for the breach of the contract is valid *unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made*.") (emphasis added). Yet Google purports to rely on these terms in withholding funds from AdSense publisher like plaintiffs' predecessor in interest, GIMMEGELT, INC.; accordingly, there is an actual controversy between the plaintiffs' predecessor in interest on the one hand, and Google on the other.

94.     Accordingly, per the foregoing, including for those reasons expressed in this complaint specifically referenced and thereby incorporated in this cause of action, plaintiffs'

predecessor in interest, GIMMEGELT, INC., pursuant to 28 U.S.C. § 2201(A) and otherwise, is entitled to an order or orders declaring these terms: (a) unconscionable, and, therefore, unenforceable against them pursuant to CAL. CIV. CODE § 1670.5(a); and (b) unreasonable liquidated damages provisions that are invalid pursuant to CAL. CIV. CODE § 1671(b), and, therefore, unenforceable as against the Plaintiffs' predecessor in interest, GIMMEGELT, INC.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (DEFENDANT ENGAGING IN RACKETEERING
### UNDER 18 U.S. CODE § 1962)

95.     Plaintiffs repeat and reiterate each and every allegation contained in paragraph # 1 through # 94 of the complaint and  incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

96.     In violation of California Labor Law set forth in this complaint, the Google's AdSense Terms and Conditions set forth in its agreement attached hereto as Exhibit "B" and "B-1", there is no breakdown as to the percentage that the advertisers keep as the result of a click and how much Google keeps, e.g., is it 50/50, 51/49, 60/40.

97.     That under the California Labor Law cited in this complaint, if the compensation is not negotiated, it has to be set forth in writing.

98.     That Google does not return 100% of the revenues tallied from "invalid clicks" to the publisher, like the plaintiffs' predecessor in interest, GIMMEGELT, INC., as Google claims it does. By acting in this manner, the Google keeps all revenue given to it by the advertisers, and earned by the publishers and have kept them to the tune of possibly billions of dollars over the years.

99.     Further, in order to boost its stock, Google although reported in its yearly financial statements for the year, 2002-2009 filed as Form 10-K with the Security and Exchange

Commission, the return or refund of money to its advertiser for invalid clicks as a financial risk, however, upon information and belief, GOOGLE never refunded fees that its advertisers have paid to it that were later attributed to click fraud and other invalid clicks.

100.   While the defendant GOOGLE may have implemented systems to identify and reduce fraudulent clicks, an increase in refunds could have negatively affected its profitability and damaged its brand.

101.   If the defendant GOOGLE failed to detect click fraud or other invalid clicks, they could face additional litigation as well as lose the confidence of its advertisers, which would cause its business to suffer.

102.   This is funny as there is no system that can identify and reduce fraudulent clicks involving intent.

103.   Also, if the Defendant GOOGLE failed to detect click fraud or other invalid clicks, their business would suffer, so they made up reasons to withhold revenues from publishers like the plaintiffs' predecessor in interest, GIMMEGELT, INC., as the defendant GOOGLE can't even give publishers any details about their accounts, and return little if anything to the advertisers, thereby keeping these revenues for themselves. They expect to refund fees in the future, NOT that they will, and from 2010-2012, and even 2013-15 although outside the scope of this lawsuit, the defendant GOOGLE did not refund or return any money to the advertiser, according to their Annual Reports filed along with the Form 10-K with the Security and Exchange Commission.  In fact, even conveniently omitted the word "invalid clicks" from their annual reports.

104.   That commencing 2010 until 2015, the Google did not report in its yearly income statements it filed in Form K10 with the Security and Exchange Commission, the return of

money to the advertiser for invalid clicks as a financial risk and upon information and belief, in its tax filings with the Internal Revenue Services. if anything was refunded to the advertiser for invalid click or for keeping the publisher like the plaintiffs' predecessor in interest, GIMMEGELT, INC., revenue as liquidated damages for "posing a significant risk to its AdWords advertisers" and on the other hand the Google refused to return 100% of the revenues tallied from purported "invalid clicks" of the publisher like the plaintiffs predecessor in interest GIMMEGELT, INC.

105.    That Google does not return 100% of the revenues tallied from "invalid clicks" to the publisher, like the plaintiffs' predecessor in interest, GIMMEGELT, INC., and carries the total revenue as income without deducting withholding for invalid clicks or posing threat to its AdWords advertisers, in order to boost its publicly traded stocks, constituting racketeering under the applicable provision of the 18 U.S. Code § 1962 – Prohibited activities, in order to show more revenues in order to boost its publicly traded stock and that the documentary material containing these records including the books, papers, documents, record or other material kept in course of the defendant's GOOGLE operation, constitutes a "racketeering activities" as defined in 18 U.S. Code § § 1961(1) and 1961(9).

106.    Additionally, the mergers and acquisitions by Google of many smaller companies over the years, using these ill-gotten gains, exemplify money laundering. To date, there have been 189 mergers and acquisitions by the Google.

107.    By reason of the foregoing, the plaintiffs demand a judgment declaring that the defendant, GOOGLE is engaged in racketeering and pursuant to 18 U.S. Code § 1964, plaintiffs be granted their Civil remedied against the defendant GOOGLE and that it be further dealt with accordingly.

45

## AS AND FOR A NINTH CAUSE OF ACTION
### (DEFENDANT ENGAGING IN CIVIL CONSPIRACY)

108.    Plaintiffs repeat and reiterate each and every allegation contained in paragraph # 1 through # 108to of the complaint and  incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

109.    Defendant GOOGLE engaged in a conspiracy to bill and/or collect advertising revenue for services which were actually and/or legitimately provided by the plaintiff's predecessor in interest to it by placing its advertisement on its websites and generating traffic for the GOOGLE's advertisers but later claiming plaintiff was posing a risk to its Adwords advertisers thus not entitled to any revenue.  Defendant GOOGLE conspired to conceal the fact that they were actually collecting revenue for advertisement which the plaintiff's predecessor in interest placed in its websites and generated traffic for its advertisers which were not actually paid to the plaintiffs claiming its websites were posing threat to its Adwrds advertisers thus not entitled to any compensation.

110.    Despite an administrative appeal, the defendants GOOGLE have refused to disclose all known or suspected reasons for non-payment of the plaintiff's rightful and legitimate earnings and revenue for generating traffic from its websites for Defendants' advertisers. Defendant GOOGLE earned substantial revenue and growth in its stock and business and market while failing to disclose that in fact they routinely and systemically collected for advertisement from its customers and not paid to the plaintiff as publisher claiming its advertisement pose threat to its AdWord advertisers or the clicks are invalid although in fact the clicks are valid and legitimate.  Thus defendants have engaged in a pattern, practice, and/or scheme to achieve a common goal and/or purpose of increasing the market and billing its customers costs for

advertisement throughout the New York, California and United States while not paying the plaintiff as publisher claiming its advertisement posing risk or its clicks are invalid although the clicks were legitimate and properly recorded in plaintiff' account maintained by it.

## AS AND FOR A TENTH CAUSE OF ACTION
### (JOINT VENTURE / JOINT ENTERPRISE)

111.     Plaintiffs repeat and reiterate each and every allegation contained in paragraph # 1 through # 110 of the complaint and  incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

112.     That the defendants GOOGLE were engaged in a joint enterprise as the parties have: (a) an agreement, either express or implied, with respect to the enterprise or endeavor; (b) a common purpose (to generate traffic and revenue); (c) a community of interest in that purpose among the advertiser, publisher and search engine provider; and (d) a right of control in the direction of the enterprise.

113.     That the defendant GOOGLE entered into a joint venture as it had an agreement which included: (i) a community of interest in the venture (Publishers, Advertisers, Consumers, AdWords program and Search Engine (Google); (ii) an AdSense agreements to share profits; (iii) an express agreement to share losses; and (iv) a mutual right to control or management of the venture.  This joint venture and/or enterprise allowed for a seamless web (Google) in which defendant share revenue derived by GOOGLE by placing advertisement of the advertisers on publishers websites which generated traffic for mutual benefits.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request the following relief:

A. That the Court award plaintiffs all appropriate monetary and compensatory damages not less than Fifty Million ($50,000,000.00) Dollars and other relief to the Plaintiffs to the greatest extent available, including an accounting or accountings; monetary relief to the greatest extent available, whether by way of damages and compensatory damages or a combination thereof, together with pre-judgment interest at the highest rate permitted by law; injunctive relief as requested herein, and to the greatest extent available, requiring, *inter alia*, that Google undertake to calculate and pay all unpaid amounts, program earnings, or earned but unpaid revenue due to the Plaintiffs as predecessor in interest, GIMMEGELT, INC., as terminated publisher, and that it cease the practices with respect to its AdSense program complained of herein; and declaratory relief, adjudging the practices complained of unlawful, and the contractual terms, including the provisions identified herein, upon which Google purports to rely in withholding all unpaid amounts, program earnings, or earned but unpaid revenue due the terminated publisher plaintiffs and, unconscionable and unenforceable, and also unreasonable, invalid, and unenforceable liquidated damages provisions; as well as plaintiffs' attorneys' fees, costs, and expenses;

B. That the Court grant plaintiffs an order or judgment as may be necessary to redress or prevent the unlawful practices complained of herein including the civil remedies under 18 U.S. Code § 1964 for engaging in prohibited activities under 18 U.S. Code § 1962; and

C. That the Court award plaintiffs such other and further relief, favorable relief as may be available and appropriate under federal or state law, or at equity.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: Brooklyn, New York
      May 23, 2016

                Yours, etc.

                _____

                CRAIG GOTTLIEB
                Plaintiff *Pro Se*
                1090 Coney Island Avenue
                Ground Floor, Room #1
                Brooklyn, New York 11230
                Tel:(718) 423-9761
                E-Mail: cragottli@aol.com

                SAUD A.H. KHOKHAR
                Plaintiff *Pro Se*
                1090 Coney Island Avenue
                Ground Floor, Room #1
                Brooklyn, New York 11230
                Tel: (718) 664-0999
                E-Mail: SK@SaudKhokhar.com

*Exhibit A*

# ASSIGNMENT OF DAMAGES AND CAUSE OF ACTION

For value received, the GIMMEGELT INC., a Nevada Corporation, authorized to do business in the State Of New York, with an address at 240-10 67th Avenue, Flushing, New York 11362, as assignor, assigns and transfers to CRAIG GOTTLIEB, with an address at 240-10 67th Avenue, Flushing, New York 11362, and SAUD A.H. KHOKHAR, with an address at 1090 Coney Island Avenue, Brooklyn, New York 11230, as assignees, their legal representatives and assigns, their use and benefit, any and all sums of money now due or owing to GIMMEGELT INC., and all claims, demands and causes of action of whatever kind and nature that assignor have had, now have, or may have against GOOGLE INC., a Delaware Corporation, with headquarters in Mountain View, Santa Clara County, California, and its subsidiaries, mother or sister organizations or entities, or any other person or persons or entity or entities, whether jointly or severally, arising out of, or for, any loss, injury, or damages sustained by it in connection with breach of contract and fraud or racketeering activities by GOOGLE INC., and its Ad Sense program or any other program in which GIMMEGELT INC., participated since its formation or any time thereafter.

This assignment is without recourse, and assignor does not guarantee payment of the aforesaid claim. Assignor agrees, however, that in the event any payment under the claim is made to assignor, GIMMEGELT INC., it will promptly transmit such payment to assignees.

Assignor appoints assignees and their legal representative and assigns, the attorney of assignor with power to demand and receive satisfaction of the assigned claim, and, in the name of assignor, but at assignees' expenses, to take whatsoever legal action may be necessary to enforce the claim.

Dated: Flushing, New York

GIMMEGELT INC.

By: _Craig Gottlieb_
CRAIG GOTTLIEB (PRESIDENT
AND SOLE SHAREHOLDER)

STATE OF NEW YORK, COUNTY OF _____ , ss.

On the 7th day of December, 2014, before me, personally appeared CRAIG GOTTLIEB, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public
My commission expires on

TANWEER AHMED KHAN
Notary Public, State of New York
No. 01KH6242757
Qualified in Kings County
My Commission Expires May 31, 20_15_

## CORPORATE RESOLUTION

STATE OF NEW YORK  )
                   :.ss.:
COUNTY OF KINGS  )

The undersigned, the president and secretary of GIMMEGELT INC., with its principal place of business at 240-10 67th Avenue, Flushing, New York 11362. (Hereinafter the "Subscriber") each being duly sworn, depose and say:

1. The undersigned certifies, represents and warrants the information set forth herein to be true, knowing full well and understanding that this certificate is made to authorize GIMMETGELT INC., as assignor, to assigns and transfers to CRAIG GOTTLIEB, with an address at 240-10 67th Avenue, Flushing, New York 11362, and SAUD A.H. KHOKHAR, with an address at 1090 Coney Island Avenue, Brooklyn, New York 11230, as assignees, their legal representatives and assigns, their use and benefit, any and all sums of money now due or owing to GIMMEGELT INC., and all claims, demands and causes of action of whatever kind and nature that assignor have had, now have, or may have against GOOGLE INC., a Delaware Corporation, with headquarters in Mountain View, Santa Clara County, California, and its subsidiaries, mother or sister organizations or entities, or any other person or persons or entity or entities, whether jointly or severally, arising out of, or for, any loss, injury, or damages sustained by it in connection with breach of contract and fraud or racketeering activities by GOOGLE INC., and its Ad Sense program or any other program in which GIMMEGELT INC., participated since its formation or any time thereafter.

Further, GIMMETGELT INC., in connection with the assignment of claim, hereby appoints assignees and their legal representative and assigns, the attorney of assignor with power to demand and receive satisfaction of the assigned claim, and, in the name of assignor, but at assignees' expenses, to take whatsoever legal action may be necessary to enforce the claim.

2. That at a meeting held on ___12/7___, 2014 of the Board of Directors of, GIMMETGELT INC., at which a quorum was present and acting throughout, it was confirmed that the following officers hold the office set forth alongside their names as of the date hereof and that the signature of each such person is their true signature:

President:            _Craig Gottlieb_

Vice-President        _Craig Gottlieb_

Secretary:            _Craig Gottlieb_

1

3. That a meeting of the Board of Directors of GIMMETGELT INC., on the aforementioned date at which a quorum was present and acting throughout, the Board of Directors unanimously voted to approve that GIMMEGELT INC., to assigns and transfers to CRAIG GOTTLIEB, with an address at 240-10 67th Avenue, Flushing, New York 11362, and SAUD A.H. KHOKHAR, with an address at 1090 Coney Island Avenue, Brooklyn, New York11230, as assignees, their legal representatives and assigns, their use and benefit, any and all sums of money now due or owing to GIMMEGELT INC., and all claims, demands and causes of action of whatever kind and nature that assignor have had, now have, or may have against GOOGLE INC., a Delaware Corporation, with headquarters in Mountain View, Santa Clara County, California, and its subsidiaries, mother or sister organizations or entities, or any other person or persons or entity or entities, whether jointly or severally, arising out of, or for, any loss, injury, or damages sustained by it in connection with breach of contract and fraud or racketeering activities by GOOGLE INC., and its Ad Sense program or any other program in which GIMMEGELT INC., participated since its formation or any time thereafter.

Further, GIMMETGELT INC., in connection with the assignment of claim, hereby appoints assignees and their legal representative and assigns, the attorney of assignor with power to demand and receive satisfaction of the assigned claim, and, in the name of assignor, but at assignees' expenses, to take whatsoever legal action may be necessary to enforce the claim.

4. That the Board of Directors unanimously voted to approve that GIMMEGELT INC., to assigns and transfers to CRAIG GOTTLIEB, with an address at 240-10 67th Avenue, Flushing, New York 11362, and SAUD A.H. KHOKHAR, with an address at 1090 Coney Island Avenue, Brooklyn, New York 11230, as assignees, their legal representatives and assigns, their use and benefit, any and all sums of money now due or owing to GIMMEGELT INC., and all claims, demands and causes of action of whatever kind and nature that assignor have had, now have, or may have against GOOGLE INC., a Delaware Corporation, with headquarters in Mountain View, Santa Clara County, California, and its subsidiaries, mother or sister organizations or entities, or any other person or persons or entity or entities, whether jointly or severally, arising out of, or for, any loss, injury, or damages sustained by it in connection with breach of contract and fraud or racketeering activities by GOOGLE INC., and its Ad Sense program or any other program in which GIMMEGELT INC., participated since its formation or any time thereafter.

Further, GIMMETGELT INC., in connection with the assignment of claim, hereby appoints assignees and their legal representative and assigns, the attorney of assignor with power to demand and receive satisfaction of the assigned claim, and, in the name of assignor, but at assignees' expenses, to take whatsoever legal action may be necessary to enforce the claim.

Furthermore, that the President, Vice President or Secretary of GIMMETGELT INC., is authorized to execute said Resolution in connection with the assignment of its claim above referred to CRAIG GOTTLIEB and SAUD A.H. KHOKHAR .

5. That a meeting of the Board of Directors of GIMMETGELT INC., held on the

2

aforementioned date at which a quorum was present and acting throughout, the Board of Directors unanimously voted to approve that for good and valuable consideration, GIMMEGELT INC., to assigns and transfers to CRAIG GOTTLIEB, with an address at 240-10 67th Avenue, Flushing, New York 11362, and SAUD A.H. KHOKHAR, with an address at 1090 Coney Island Avenue, Brooklyn, New York 11230, as assignees, their legal representatives and assigns, their use and benefit, any and all sums of money now due or owing to GIMMEGELT INC., and all claims, demands and causes of action of whatever kind and nature that assignor have had, now have, or may have against GOOGLE INC., a Delaware Corporation, with headquarters in Mountain View, Santa Clara County, California, and its subsidiaries, mother or sister organizations or entities, or any other person or persons or entity or entities, whether jointly or severally, arising out of, or for, any loss, injury, or damages sustained by it in connection with breach of contract and fraud or racketeering activities by GOOGLE INC., and its Ad Sense program or any other program in which GIMMEGELT INC., participated since its formation or any time thereafter.

Further, GIMMETGELT INC., in connection with the assignment of claim, hereby appoints assignees and their legal representative and assigns, the attorney of assignor with power to demand and receive satisfaction of the assigned claim, and, in the name of assignor, but at assignees' expenses, to take whatsoever legal action may be necessary to enforce the claim.

6. That the following is a true copy of certain resolutions duly and unanimously adopted at a meeting of the Board of Directors of "Subscriber" duly called and held on the aforesaid date, at which a quorum was present and acting throughout, and which are not conflict with the Certificate of Incorporation, By Laws, rules and regulations of said corporation, and which resolutions have not been modified or rescinded and are still in full force and effect:

**WHEREAS,** the Board of Directors of GIMMETGELT INC., deems it to be in the best interests of this corporation to for a good and valuable consideration to assigns and transfers to CRAIG GOTTLIEB, with an address at 240-10 67th Avenue, Flushing, New York 11362, and SAUD A.H. KHOKHAR, with an address at 1090 Coney Island Avenue, Brooklyn, New York 11230, as assignees, their legal representatives and assigns, their use and benefit, any and all sums of money now due or owing to GIMMEGELT INC., and all claims, demands and causes of action of whatever kind and nature that assignor have had, now have, or may have against GOOGLE INC., a Delaware Corporation, with headquarters in Mountain View, Santa Clara County, California, and its subsidiaries, mother or sister organizations or entities, or any other person or persons or entity or entities, whether jointly or severally, arising out of, or for, any loss, injury, or damages sustained by it in connection with breach of contract and fraud or racketeering activities by GOOGLE INC., and its Ad Sense program or any other program in which GIMMEGELT INC., participated since its formation or any time thereafter.

Further, GIMMETGELT INC., in connection with the assignment of claim, hereby appoints assignees and their legal representative and assigns, the attorney of assignor with power to demand and receive satisfaction of the assigned claim, and, in the name of assignor, but at

3

assignees' expenses, to take whatsoever legal action may be necessary to enforce the claim.

**NOW, THEREFORE,** be it

**RESOLVED,** that the President, Vice President or Secretary of GMMEGELT INC., is authorized to execute said Resolution in connection with the assignment and transfers to CRAIG GOTTLIEB, with an address at 240-10 67th Avenue, Flushing, New York 11362, and SAUD A.H. KHOKHAR, with an address at 1090 Coney Island Avenue, Brooklyn, New York 11230, as assignees, their legal representatives and assigns, their use and benefit, any and all sums of money now due or owing to GIMMEGELT INC., and all claims, demands and causes of action of whatever kind and nature that assignor have had, now have, or may have against GOOGLE INC., a Delaware Corporation, with headquarters in Mountain View, Santa Clara County, California, and its subsidiaries, mother or sister organizations or entities, or any other person or persons or entity or entities, whether jointly or severally, arising out of, or for, any loss, injury, or damages sustained by it in connection with breach of contract and fraud or racketeering activities by GOOGLE INC., and its Ad Sense program or any other program in which GIMMEGELT INC., participated since its formation or any time thereafter.

Further, GIMMETGELT INC., in connection with the assignment of claim, hereby appoints assignees and their legal representative and assigns, the attorney of assignor with power to demand and receive satisfaction of the assigned claim, and, in the name of assignor, but at assignees' expenses, to take whatsoever legal action may be necessary to enforce the claim.

_____
Director

_____
Director

Sworn to before me this
7th day of December, 2014

_____
**NOTARY PUBLIC**

TANWEER AHMED KHAN
Notary Public, State of New York
No. 01KH6242057
Qualified in Kings County
My Commission Expires May 31, 20__

The actions of the Board of Directors of GIMMETGELT INC., approving of the subscribing and making as set forth in the above recited resolutions of the Board of Directors, and the execution of this Resolution with regard to the assignment of GIMMETGELT INC's claim against the Google Inc., is hereby approved, ratified and confirmed by undersigned who constitute at least 100% of the stockholders of GIMMETGELT INC.,.

_____
CRAIG GOTTLEB
(100% Stockholder)

4

The undersigned, as secretary of GIMMETGELT INC., does hereby represent, warrant and certify unto Craig Gottlieb and Saud A.H. Khokhar that above stockholders of GIMMEGELT INC., constitutes 100% of the stockholders of record on the corporate stockholder record book of GIMMEGELT INC., on of this ~~~~~~ day of ~~~~~~, 2014.

CRAIG GOTTLEB
(Secretary)

Sworn to before me this
7th day of December, 2014

NOTARY PUBLIC

TANWEER AHMED KHAN
Notary Public, State of New York
No. 01KH6242057
Qualified in Kings County
My Commission Expires May 31, 20 15

5

*Exhibit B*

# Google AdSense Online Terms of Service

## 1.  Welcome to AdSense!

Thanks for your interest in our search and advertising services (the "**Services**")! By using our Services, you agree to these terms (the "**AdSense Terms**"), the AdSense Program Policies and the Google Branding Guidelines (collectively, the "**Agreement**"). If ever in conflict, to the extent of such conflict, the AdSense Terms will take precedence over any other terms of the Agreement.  Please read the Agreement carefully.

As used in the Agreement, "you" or "publisher" means the individual or entity using the Services (and/or any individual, entity or successor entity, agency or network acting on your behalf), "we," "us" or "Google" means Google Inc., and the "parties" means you and Google.

## 2.  Access to the Services; AdSense Accounts

Your use of the Services is subject to your creation and our approval of an AdSense account (an "**Account**").  We have the right to refuse or limit your access to the Services. By submitting an application to use the Services, if you are an individual, you represent that you are at least 18 years of age.  You may only have one Account.

By enrolling in AdSense, you permit Google to serve, as applicable, (i) advertisements and other content ("**Ads**"), (ii) Google search boxes and search results, and (iii) related search queries and other links to your websites, mobile applications, media players, mobile content, and/or other properties approved by Google (each individually a "**Property**").  In addition, you grant Google the right to access, index and cache the Properties, or any portion thereof, including by automated means. Google may refuse to provide the Services to any Property.

Any Property that is a software application and accesses our Services (a) may require preapproval by Google in writing, and (b) must comply with Google's Software Principles.

## 3.  Using our Services

You may use our Services only as permitted by this Agreement and any applicable laws.  Don't misuse our Services. For example, don't interfere with our Services or try to access them using a method other than the interface and the instructions that we provide.

You may discontinue your use of any Service at any time by removing the relevant code from your Properties.

## 4.  Changes to our Services; Changes to the Agreement

We are constantly changing and improving our Services. We may add or remove functionalities or features of the Services at any time, and we may suspend or stop a Service altogether.

We may modify the Agreement at any time. We'll post any modifications to the AdSense Terms on this page and any modifications to the AdSense Program Policies or the Google Branding Guidelines on their respective pages.  Changes will not apply retroactively and generally will become effective 14 days after they are posted. However, changes addressing new functions for a Service or changes made for legal reasons will be effective immediately. If you don't agree to any modified terms in the Agreement, you'll have to stop using the affected Services.

## 5.  Payments

Subject to this Section 5 and Section 10 of these AdSense Terms, you will receive a payment related to the number of valid clicks on Ads

displayed on your Properties, the number of valid impressions of Ads displayed on your Properties, or other valid events performed in connection with the display of Ads on your Properties, in each case as determined by Google.

Except in the event of termination, we will pay you by the end of the calendar month following any calendar month in which the earned balance in your Account equals or exceeds the applicable payment threshold. If you implement search Services, our payments may be offset by any applicable fees for such Services.

Unless expressly authorized in writing by Google, you may not enter into any type of arrangement with a third party where that third party receives payments made to you under the Agreement or other financial benefit in relation to the Services.

Payments will be calculated solely based on our accounting. Payments to you may be withheld to reflect or adjusted to exclude any amounts refunded or credited to advertisers and any amounts arising from invalid activity, as determined by Google in its sole discretion. Invalid activity is determined by Google in all cases and includes, but is not limited to, (i) spam, invalid queries, invalid impressions or invalid clicks on Ads generated by any person, bot, automated program or similar device, including through any clicks or impressions originating from your IP addresses or computers under your control; (ii) clicks solicited or impressions generated by payment of money, false representation, or requests for end users to click on Ads or take other actions; (iii) Ads served to end users whose browsers have JavaScript disabled; and (iv) clicks or impressions co-mingled with a significant amount of the activity described in (i, ii, and iii) above.

In addition to our other rights and remedies, we may (a) withhold and offset any payments owed to you under the Agreement against any fees you owe us under the Agreement or any other agreement, or (b) require you to refund us within 30 days of any invoice, any amounts we may have overpaid to you in prior periods. If you dispute any payment made or withheld relating to the Services, you must notify Google in writing within 30 days of any such payment. If you do not, any claim relating to the disputed payment is waived. If an advertiser whose Ads are displayed on any Property defaults on payment to Google, we may withhold payment or charge back your account.

To ensure proper payment, you are responsible for providing and maintaining accurate contact and payment information in your Account. You are responsible for any charges assessed by your bank or payment provider.

## 6. Taxes

As between you and Google, Google is responsible for all taxes (if any) associated with the transactions between Google and advertisers in connection with Ads displayed on the Properties. You are responsible for all taxes (if any) associated with the Services, other than taxes based on Google's net income. All payments to you from Google in relation to the Services will be treated as inclusive of tax (if applicable) and will not be adjusted.

## 7. Intellectual Property; Brand Features

Other than as set out expressly in the Agreement, neither party will acquire any right, title or interest in any intellectual property rights belonging to the other party or to the other party's licensors.

If Google provides you with software in connection with the Services, we grant you a  non-exclusive, non-sublicensable license for use of such software. This license is for the sole purpose of enabling you to use and enjoy the benefit of the Services as provided by Google, in the manner permitted by the Agreement.  Other than distributing content via the AdMob SDK, you may not copy, modify, distribute, sell, or lease any part of our Services or included software, nor may you reverse engineer or attempt to extract the source code of that software, unless laws prohibit those restrictions or you have our written permission. You will not remove, obscure, or alter Google's copyright notice, Brand Features, or other proprietary rights notices affixed to or contained within any Google services, software, or documentation.

We grant you a non-exclusive, non-sublicensable license to use Google's trade names, trademarks, service marks, logos, domain names, and other distinctive brand features ("**Brand Features**") solely in connection with your use of the Services and in accordance with the Agreement and the

Google Branding Guidelines. We may revoke this license at any time. Any goodwill arising from your use of Google's Brand Features will belong to Google.

We may include your name and Brand Features in our presentations, marketing materials, customer lists and financial reports.

### 8.  Privacy

Our privacy policy explains how we treat your personal data and protect your privacy when you use our Services. By using our Services, you agree that Google can use such data in accordance with our privacy policy.

You will ensure that at all times you use the Services, the Properties have a clearly labeled and easily accessible privacy policy that provides end users with clear and comprehensive information about cookies, device-specific information, location information and other information stored on, accessed on, or collected from end users' devices in connection with the Services, including, as applicable, information about end users' options for cookie management. You will use commercially reasonable efforts to ensure that an end user gives consent to the storing and accessing of cookies, device-specific information, location information or other information on the end user's device in connection with the Services where such consent is required by law.

### 9.  Confidentiality

You agree not to disclose Google Confidential Information without our prior written consent. "**Google Confidential Information**" includes: (a) all Google software, technology and documentation relating to the Services; (b) click-through rates or other statistics relating to Property performance as pertaining to the Services; (c) the existence of, and information about, beta features in a Service; and (d) any other information made available by Google that is marked confidential or would normally be considered confidential under the circumstances in which it is presented. Google Confidential Information does not include information that you already knew prior to your use of the Services, that becomes public through no fault of yours, that was independently developed by you, or that was lawfully given to you by a third party. Notwithstanding this Section 9, you may accurately disclose the amount of Google's gross payments resulting from your use of the Services.

### 10. Termination

You may terminate the Agreement at any time by completing the account cancellation process. The Agreement will be considered terminated within 10 business days of Google's receipt of your notice. If you terminate the Agreement and your earned balance equals or exceeds the applicable threshold, we will pay you your earned balance within approximately 90 days after the end of the calendar month in which the Agreement is terminated. Any earned balance below the applicable threshold will remain unpaid.

Google may at any time terminate the Agreement, or suspend or terminate the participation of any Property in the Services for any reason. If we terminate the Agreement due to your breach or due to invalid activity, we may withhold unpaid amounts or charge back your account. If you breach the Agreement or Google suspends or terminates your Account, you (i) will not be allowed to create a new Account, and (ii) may not be permitted to monetize content on other Google products.

### 11. Indemnity

You agree to indemnify and defend Google, its affiliates, agents, and advertisers from and against any and all third-party claims and liabilities arising out of or related to the Properties, including any content served on the Properties that is not provided by Google, your use of the Services, or your breach of any term of the Agreement. Google's advertisers are third-party beneficiaries of this indemnity.

## 12. Representations; Warranties; Disclaimers

You represent and warrant that (i) you have full power and authority to enter into the Agreement; (ii) you are the owner of, or are legally authorized to act on behalf of the owner of, each Property; (iii) you are the technical and editorial decision maker in relation to each Property on which the Services are implemented and that you have control over the way in which the Services are implemented on each Property; (iv) Google has never previously terminated or otherwise disabled an AdSense account created by you due to your breach of the Agreement or due to invalid activity; (v) entering into or performing under the Agreement will not violate any agreement you have with a third party or any third-party rights; and (vi) all of the information provided by you to Google is correct and current.

OTHER THAN AS EXPRESSLY SET OUT IN THE AGREEMENT, WE DO NOT MAKE ANY PROMISES ABOUT THE SERVICES. FOR EXAMPLE, WE DON'T MAKE ANY COMMITMENTS ABOUT THE CONTENT WITHIN THE SERVICES, THE SPECIFIC FUNCTION OF THE SERVICES, OR THEIR PROFITABILITY, RELIABILITY, AVAILABILITY, OR ABILITY TO MEET YOUR NEEDS. WE PROVIDE EACH SERVICE "AS IS". TO THE EXTENT PERMITTED BY LAW, WE EXCLUDE ALL WARRANTIES, EXPRESS, STATUTORY OR IMPLIED. WE EXPRESSLY DISCLAIM THE WARRANTIES OR CONDITIONS OF NONINFRINGEMENT, MERCHANTABILITY, AND FITNESS FOR A PARTICULAR PURPOSE.

## 13. Limitation of Liability

TO THE EXTENT PERMITTED BY LAW, EXCEPT FOR ANY INDEMNIFICATION OBLIGATIONS HEREUNDER OR YOUR BREACH OF ANY INTELLECTUAL PROPERTY RIGHTS, CONFIDENTIALITY OBLIGATIONS AND/OR PROPRIETARY INTERESTS RELATING TO THE AGREEMENT (I) IN NO EVENT SHALL EITHER PARTY BE LIABLE UNDER THE AGREEMENT FOR ANY CONSEQUENTIAL, SPECIAL, INDIRECT, EXEMPLARY, OR PUNITIVE DAMAGES WHETHER IN CONTRACT, TORT OR ANY OTHER THEORY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY, AND (II) EACH PARTY'S AGGREGATE LIABILITY UNDER THE AGREEMENT IS LIMITED TO THE NET AMOUNT RECEIVED AND RETAINED BY THAT PARTICULAR PARTY IN CONNECTION WITH THIS AGREEMENT DURING THE THREE MONTH PERIOD IMMEDIATELY PRECEDING THE DATE OF THE CLAIM. Each party acknowledges that the other party has entered into the Agreement relying on the limitations of liability stated herein and that those limitations are an essential basis of the bargain between the parties.

## 14. Miscellaneous

**Entire Agreement; Amendments.** The Agreement is our entire agreement relating to your use of the Services and supersedes any prior or contemporaneous agreements on that subject. This Agreement may be amended (i) in a writing signed by both parties that expressly states that it is amending the Agreement, or (ii) as set forth in Section 4, if you keep using the Services after Google modifies the Agreement.

**Assignment.** You may not assign or transfer any of your rights under the Agreement.

**Independent Contractors.** The parties are independent contractors and the Agreement does not create an agency, partnership, or joint venture.

**No Third-Party Beneficiaries.** Other than as set forth in Section 11, this Agreement does not create any third-party beneficiary rights.

**No Waiver.** Other than as set forth in Section 5, the failure of either party to enforce any provision of the Agreement will not constitute a waiver.

**Severability.** If it turns out that a particular term of the Agreement is not enforceable, the balance of the Agreement will remain in full force and effect.

**Survival.** Sections 7, 9, 10, 11, 13, and 14 of these AdSense Terms will survive termination.

**Governing Law; Venue.** All claims arising out of or relating to this Agreement or the Services will be governed by California law, excluding California's conflict of laws rules, and will be litigated exclusively in the federal or state courts of Santa Clara County, California, USA, and you and

Google consent to personal jurisdiction in those courts.

**Force Majeure.** Neither party will be liable for inadequate performance to the extent caused by a condition (for example, natural disaster, act of war or terrorism, riot, labor condition, governmental action, and Internet disturbance) that was beyond the party's reasonable control.

**Communications.** In connection with your use of the Services, we may contact you regarding service announcements, administrative messages, and other information. You may opt out of some of those communications in your Account settings. For information about how to contact Google, please visit our contact page.

\*   \*   \*

## 15. Service-Specific Terms

If you choose to implement any of the following Services on a Property, you also agree to the additional terms identified below:

**AdMob:** the AdMob Publisher Guidelines and Policies.

**Custom Search Engine:** the Custom Search Engine Terms of Service.

*Exhibit B-1*

Google AdSense™ Online Standard Terms and Conditions

PLEASE READ VERY CAREFULLY THESE TERMS AND CONDITIONS AND THE FAQ
BEFORE REGISTERING FOR THE GOOGLE ADSENSE ONLINE PROGRAM.
PARTICIPATION IN THE GOOGLE ADSENSE ONLINE PROGRAM INDICATES THAT
YOU ACCEPT THESE TERMS AND CONDITIONS. IF YOU DO NOT ACCEPT THESE
TERMS AND CONDITIONS, PLEASE DO NOT REGISTER FOR OR PARTICIPATE IN
THE GOOGLE ADSENSE ONLINE PROGRAM.

Introduction. This agreement ("Agreement") between You and Google Inc. ("Google") consists
of these Google AdSense Online Program (the "Program") Standard Terms and Conditions
("Terms and Conditions"). A description of the Program, as generally offered by Google, is
available at the Program Frequently Asked Questions ("FAQ") URL, located at
https://www.google.com/adsense/faq, or such other URL as Google may provide from time to
time. "You" or "Publisher" means any entity identified in an enrollment form submitted by the
same or affiliated persons, and/or any agency or network acting on its (or their) behalf, which
shall also be bound by the terms of this Agreement.

1.

Program Participation. Participation in the Program is subject to Google's prior approval and
Your continued compliance with the Program Policies ("Program Policies"), located at
https://www.google.com/adsense/policies, and/or such other URL as Google may provide from
time to time. Google reserves the right to refuse participation to any applicant or participant at
any time in its sole discretion. By enrolling in the Program, You represent that You are at least
18 years of age and agree that Google may serve (a) third party and/or Google provided
advertisements and/or other content (such third party provided advertisements, Google provided
advertisements and other content, collectively, "Ads"), provided, however, that if Google serves
non-compensated content, You will have the ability to opt out of receiving such content as part
of the Program, (b) related Google queries and/or Ad search box(es) (collectively, "Links"), (c)
Google Web and/or Site search results (collectively, "Search Results"), and/or (d) Google
referral Ads ("Referral Buttons"), each in connection with the Web site(s), media player(s),
video content and/or mobile content that You designate, or such other properties expressly
authorized in writing by Google (including by electronic mail) (such other properties, "Other
Properties"), and the Atom, RSS, or other feeds distributed through such Web site(s) , media
player(s), video content, mobile content and/or Other Properties (each such Web site, media
player, video content, mobile content, Other Property or feed, a "Property"). For the avoidance of
doubt, any reference in this Agreement or the Program Policies to an individual "Web page",
"Web site", "Web site page" or the like that is part of the Property will also mean feeds and
media players distributed through such Web site. Multiple accounts held by the same individual
or entity are subject to immediate termination unless expressly authorized in writing by Google
(including by electronic mail). In some circumstances expressly authorized in writing by Google
(including by electronic mail), You may enroll in the Program and create an account for the sole
purpose of receiving payment from Google, and not, for purposes of clarification, for the purpose
of displaying Ads, Links, Search Results and/or Referral Buttons on a Property. If, however,
You subsequently use your Account to participate in the Program (i.e. for the purpose of
displaying Ads, Links, Search Results and/or Referral Buttons on a Property), then such use of
the Program will be governed by the terms of this Agreement. You must have and abide by an
appropriate privacy policy that clearly discloses that third parties may be placing and reading

cookies on your users' browser, or using web beacons to collect information, in the course of ads being served on your website. Your privacy policy should also include information about user options for cookie management.

2.

Implementation and Operation of Ads, Search Results, and Referrals. You agree to comply with the specifications provided by Google from time to time to enable proper delivery, display, tracking, and reporting of Ads, Links, Search Results, Referral Buttons, and Google Brand Features (as defined in Section 12 below) in connection with Your Property(ies), including without limitation by not modifying the JavaScript or other programming provided to You by Google in any way, unless expressly authorized in writing by Google (including by electronic mail).

- AdSense for Search. If You have elected to receive Search Results, You will display on Your Property(ies) a Google search box (a "Search Box") in accordance with the specifications provided by Google. Except for related Google queries, all search queries (including queries entered into an Ad search box) must originate from individual human end users inputting data directly into a Search Box (or Ad search box, as applicable) on Your Property(ies). You will send any and all queries (without editing, filtering, truncating, appending terms to or otherwise modifying such queries individually or in the aggregate) to Google and Google will use commercially reasonable efforts to provide You with corresponding Search Results and/or Ads, as applicable and as available. Search Results and any accompanying Ads will be displayed on Web pages that may be hosted by Google (each, a "Search Results Page"), and the format, look and feel of those Web pages hosted by Google may be modified by Google from time to time.

- AdSense for Content. All content and Property-based Ads (and Ads served in response to end user clicks on and queries entered into Links, if any) shall be grouped by Google and displayed with Links (where applicable) to end users of the Property(ies) as ad units (such groups of Ads and/or Links collectively referred to as "Ad Units") in standard formats as offered generally by Google from time to time, as may be described in the FAQ. You may select a format approved by Google for the display of Ad Units in connection with the Property(ies), but You acknowledge and agree that Ads and/or Links: (i) shall only be displayed in connection with the Property(ies), each of which is subject to review and approval by Google in its discretion at any time; and (ii) shall be subject to the placement guidelines set forth herein.

- Referrals. If You have elected to use the Google AdSense Referrals feature, You will implement any Referral Buttons on Your Property(ies) in accordance with the specifications provided by Google. End users who click on a Referral Button will be directed to a Web page that may be hosted by Google ("Referral Page"), and the format, look and feel of those Web pages hosted by Google may be modified by Google from time to time. A "Referral Event" will be initiated when an end user clicks on a Referral Button from the Property and will be completed when the referral requirements for the relevant product are satisfied in accordance with this Agreement. Such referral requirements, along with the payment amount applicable to the Referral Event, are located at https://www.google.com/adsense/referrals, or such other URL as Google may provide from time to time. You agree to comply with the specifications provided by Google from time to

2

time to enable proper tracking and reporting of Referral Events in connection with Your Property. You shall not promote or facilitate a Referral Event by any means other than displaying a Referral Button on the Property, unless expressly authorized in writing by Google (including by electronic mail).

• AdSense for Video. If you have elected to use AdSense for Video, Your participation is subject to your continued compliance with the AdSense for Video Program policies located at http://adsense.google.com/support/bin/answer.py?answer=73987 or the URL as Google may provide from time to time. All Ads (including Ads served in response to end user clicks on and queries entered into Links, if any) shall be (1) grouped by Google and displayed with Links (where applicable) to end users of the Property(ies) as Ad Unit(s) or (2) pre-, post- or interstitial roll in connection with third party video content, in each case in standard formats as offered generally by Google from time to time, as may be further described in the applicable policies. You acknowledge and agree that the Ads will be displayed on the Property in a video format approved by Google, and that such Ads: (i) shall only be displayed in connection with the Property(ies) and non-advertisement video content (collectively "Video Media"), all of which is subject to review and approval by Google in its discretion at any time; and (ii) shall only be requested in connection with end user initiated Video Media. In addition, You agree that You may only display one (1) Ad Unit within Your media player at any single time, unless otherwise approved by Google in writing.

• General; Serviced Pages; Filtering; Beta Features. You agree not to display on the same Web page in connection with which any Ad Unit, Ad, Link, Search Box, or Referral Button is displayed (a "Serviced Page") any advertisement(s) or content than an end user of Your Property(ies) would reasonably confuse with a Google advertisement or otherwise associate with Google. Certain Google services available as part of the Program may contain filtering capability, such as SafeSearch or AdSafe, that You may access through Your account. However, if You elect to enable any such filters, You acknowledge and agree that: (i) it is Your responsibility to enable such features in accordance with the specifications provided by Google, and (ii) Google does not and cannot commit that all results (including Ads, Links and Search Results) will be limited to results elected by enabling such filter(s). Some Program features are identified as "Beta" or otherwise unsupported ("Beta Features"). To the fullest extent permitted by law, Beta Features are provided "as is" and at Your option and risk. You shall not disclose to any third party any information from Beta Features, existence of non-public Beta Features or access to Beta Features.

3.
Communications Solely With Google. You agree to direct to Google, and not to any advertiser, any communication regarding any Ad(s) or Link(s) displayed in connection with Your Property(ies).

4.
Parties' Responsibilities. You are solely responsible for the Property(ies), including all content and materials, maintenance and operation thereof, the proper implementation of Google's specifications, and adherence to the terms of this Agreement, including compliance with the

Program Policies. Google reserves the right to investigate, at its own discretion, any activity that may violate this Agreement, including but not limited to any use of a software application to access Ads, Links, Search Results, or Referral Buttons or to complete any Referral Event, or any engagement in any activity prohibited by this Agreement. Google is not responsible for anything related to Your Property(ies), including without limitation the receipt of queries from end users of Your Property(ies) or the transmission of data between Your Property(ies) and Google. In addition, Google shall not be obligated to provide notice to You in the event that any Ad, Link, Search Result, or Referral Button is not being displayed properly to, or Referral Event is not being completed properly by, end users of the Property(ies).

5.

Prohibited Uses. You shall not, and shall not authorize or encourage any third party to: (i) directly or indirectly generate queries, Referral Events, or impressions of or clicks on any Ad, Link, Search Result, or Referral Button  (including without limitation by clicking on "play" for any video Ad) through any automated, deceptive, fraudulent or other invalid means, including but not limited to through repeated manual clicks, the use of robots or other automated query tools and/or computer generated search requests, and/or the unauthorized use of other search engine optimization services and/or software; (ii) edit, modify, filter, truncate or change the order of the information contained in any Ad, Link, Ad Unit, Search Result, or Referral Button, or remove, obscure or minimize any Ad, Link, Ad Unit, Search Result, or Referral Button in any way without authorization from Google; (iii) frame, minimize, remove or otherwise inhibit the full and complete display of any Web page accessed by an end user after clicking on any part of an Ad ("Advertiser Page"), any Search Results Page, or any Referral Page; (iv) redirect an end user away from any Advertiser Page, Search Results Page, or Referral Page; provide a version of the Advertiser Page, Search Results Page, or Referral Page that is different from the page an end user would access by going directly to the Advertiser Page, Search Results Page, or Referral Page; intersperse any content between the Ad and the Advertiser Page, between the page containing the Search Box and the Search Results Page, or between the Referral Button and the Referral Page; or otherwise provide anything other than a direct link from an Ad to an Advertiser Page, from the page containing the Search Box to the Search Results Page, or from the Referral Button to the Referral Page; (v) display any Ad(s), Link(s), or Referral Button(s) on any Web page or any Web site that contains any pornographic, hate-related, violent, or illegal content; (vi) directly or indirectly access, launch, and/or activate Ads, Links, Search Results, or Referral Buttons through or from, or otherwise incorporate the Ads, Links, Search Results, or Referral Buttons in, any software application, Web site, or other means other than Your Property(ies), and then only to the extent expressly permitted by this Agreement; (vii) "crawl", "spider", index or in any non-transitory manner store or cache information obtained from any Ads, Links, Search Results, or Referral Events, or any part, copy, or derivative thereto; (viii) act in any way that violates any Program Policies posted on the Google Web Site, as may be revised from time to time, or any other agreement between You and Google (including without limitation the Google AdWords program terms); (ix) disseminate malware; (x) create a new account to use the Program after Google has terminated this Agreement with You as a result of your breach of this Agreement; or (xi) engage in any action or practice that reflects poorly on Google or otherwise disparages or devalues Google's reputation or goodwill. You acknowledge that any attempted participation or violation of any of the foregoing is a material breach of this Agreement and that we may pursue any and all applicable legal and equitable remedies against You, including an

immediate suspension of Your account or termination of this Agreement, and the pursuit of all available civil or criminal remedies.

6.

Termination; Cancellation. Subject to any third party agreements You may have with other Google customers (e.g., Your Web hosting company), You may stop displaying Ads, Links, Search Boxes, or Referral Buttons on any Property in the Program with or without cause at any time by removing the Google JavaScript or similar programming from Your Properties. You may terminate this Agreement with or without cause at any time by sending written notice of your desire to cancel Your participation in the Program to adsense-support@google.com. This Agreement will be deemed terminated within ten (10) business days of Google's receipt of Your notice. Google may investigate any activity that may violate this Agreement. Google may at any time, in its sole discretion, terminate all or part of the Program, terminate this Agreement, or suspend or terminate the participation of any Property in all or part of the Program for any reason. In addition, Google reserves the right to terminate without notice any account that has not generated a sufficient number of valid clicks on Ads or Referral Buttons or valid impressions of Ads (in each case as measured by Google) for a period of two (2) months or more. Upon termination of participation of any Property in the Program or termination of this Agreement for any reason, Sections 3, 6 through 10, and 14 through 17 shall survive termination.

7.

Confidentiality. You agree not to disclose Google Confidential Information without Google's prior written consent. "Google Confidential Information" includes without limitation: (a) all Google software, technology, programming, specifications, materials, guidelines and documentation relating to the Program; (b) click-through rates or other statistics relating to Property performance in the Program provided to You by Google; and (c) any other information designated in writing by Google as "Confidential" or an equivalent designation. However, You may accurately disclose the amount of Google's gross payments to You pursuant to the Program. Google Confidential Information does not include information that has become publicly known through no breach by You or Google, or information that has been (i) independently developed without access to Google Confidential Information, as evidenced in writing; (ii) rightfully received by You from a third party; or (iii) required to be disclosed by law or by a governmental authority.

8.

No Guarantee. Google makes no guarantee regarding the level of impressions of Ads or clicks on any Ad or Referral Button, the timing of delivery of such impressions and/or clicks, the completion of Referral Events, or the amount of any payment to be made to You under this Agreement. In addition, for the avoidance of doubt, Google does not guarantee the Program will be operable at all times or during any down time (i) caused by outages to any public Internet backbones, networks or servers, (ii) caused by any failures of Your equipment, systems or local access services, (iii) for previously scheduled maintenance or (iv) relating to events beyond Google's (or its wholly owned subsidiaries') control such as strikes, riots, insurrection, fires, floods, explosions, war, governmental action, labor conditions, earthquakes, natural disasters, or interruptions in Internet services to an area where Google (or its wholly owned subsidiaries) or Your servers are located or co-located.

9.

<u>No Warranty</u>. GOOGLE MAKES NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION WITH RESPECT TO ADVERTISING, LINKS, SEARCH, REFERRALS, AND OTHER SERVICES, AND EXPRESSLY DISCLAIMS THE WARRANTIES OR CONDITIONS OF NONINFRINGEMENT, MERCHANTABILITY, AND FITNESS FOR ANY PARTICULAR PURPOSE. TO THE EXTENT ADS, LINKS, AND SEARCH RESULTS ARE BASED ON OR DISPLAYED IN CONNECTION WITH NON-GOOGLE CONTENT, GOOGLE SHALL NOT HAVE ANY LIABILITY IN CONNECTION WITH THE DISPLAY OF SUCH ADS, LINKS, AND SEARCH RESULTS.

10.

<u>Limitations of Liability; Force Majeure</u>. EXCEPT FOR ANY INDEMNIFICATION AND CONFIDENTIALITY OBLIGATIONS HEREUNDER OR YOUR BREACH OF ANY INTELLECTUAL PROPERTY RIGHTS AND/OR PROPRIETARY INTERESTS RELATING TO THE PROGRAM, (i) IN NO EVENT SHALL EITHER PARTY BE LIABLE UNDER THIS AGREEMENT FOR ANY CONSEQUENTIAL, SPECIAL, INDIRECT, EXEMPLARY, OR PUNITIVE DAMAGES WHETHER IN CONTRACT, TORT OR ANY OTHER LEGAL THEORY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY AND (ii) GOOGLE'S AGGREGATE LIABILITY TO PUBLISHER UNDER THIS AGREEMENT FOR ANY CLAIM IS LIMITED TO THE NET AMOUNT PAID BY GOOGLE TO PUBLISHER DURING THE THREE MONTH PERIOD IMMEDIATELY PRECEDING THE DATE OF THE CLAIM. Each party acknowledges that the other party has entered into this Agreement relying on the limitations of liability stated herein and that those limitations are an essential basis of the bargain between the parties. Without limiting the foregoing and except for payment obligations, neither party shall have any liability for any failure or delay resulting from any condition beyond the reasonable control of such party, including but not limited to governmental action or acts of terrorism, earthquake or other acts of God, labor conditions, and power failures.

11.

<u>Payment</u>. You shall receive a payment related to the number of valid clicks on Ads, the number of valid impressions of Ads, the number of valid completions of Referral Events initiated through Referral Buttons displayed in connection with Your Property(ies), and/or other events performed in connection with the display of Ads on Your Property(ies), in each case as determined by Google for its participants in the Program. If You have elected to receive Search Results, this payment will be offset by fees applicable to Search Results.

Unless otherwise agreed to by the parties in writing (including by electronic mail), payments to You shall be sent by Google within approximately thirty (30) days after the end of each calendar month that Ads or Referral Buttons are running on Your Property or that Ads are running on Search Results Pages if Your earned balance is $100 or more. In the event the Agreement is terminated, Google shall pay Your earned balance to You within approximately ninety (90) days after the end of the calendar month in which the Agreement is terminated by You (following Google's receipt of Your written request, including by email, to terminate the Agreement) or by Google. In no event, however, shall Google make payments for any earned balance less than $10. Notwithstanding the foregoing, Google shall not be liable for any payment based on: (a) any amounts which result from invalid queries, invalid Referral Events, or invalid clicks or

6

impressions on Ads generated by any person, bot, automated program or similar device, as reasonably determined by Google, including without limitation through any clicks or impressions (i) originating from Your IP addresses or computers under Your control, (ii) solicited by payment of money, false representation, or request for end users to click on Ads, or (iii) solicited by payment of money, false representation, or any illegal or otherwise invalid request for end users to complete Referral Events; (b) Ads or Referral Buttons delivered to end users whose browsers have JavaScript disabled; (c) Ads benefiting charitable organizations and other placeholder or transparent Ads that Google may deliver; or (d) clicks co-mingled with a significant number of invalid clicks described in (a) above, or as a result of any breach of this Agreement by You for any applicable pay period. Google reserves the right to withhold payment or charge back Your account due to any of the foregoing or any breach of this Agreement by You, pending Google's reasonable investigation of any of the foregoing or any breach of this Agreement by You, or in the event that an advertiser whose Ads are displayed in connection with Your Property(ies) defaults on payment for such Ads to Google. In addition, if You are past due on any payment to Google in connection with any Google program (including without limitation the Google AdWords program), Google reserves the right to withhold payment until all outstanding payments have been made or to offset amounts owed to You in connection with the Program by amounts owed by You to Google. To ensure proper payment, You are solely responsible for providing and maintaining accurate address and other contact information as well as payment information associated with Your account. For U.S. taxpayers, this information includes without limitation a valid U.S. tax identification number and a fully-completed Form W-9. For non-U.S. taxpayers, this information includes without limitation either a signed certification that the taxpayer does not have U.S. Activities (as described on the Google AdSense: Tax Information Page located at https://www.google.com/adsense/taxinfo, or such other URL as Google may provide from time to time) or a fully-completed Form W-8 or other form, which may require a valid U.S. tax identification number, as required by the U.S. tax authorities. Any bank fees related to returned or cancelled checks due to a contact or payment information error or omission may be deducted from the newly issued payment. You agree to pay all applicable taxes or charges imposed by any government entity in connection with Your participation in the Program. Google may change its pricing and/or payment structure at any time. If You dispute any payment made under the Program, You must notify Google in writing within thirty (30) days of any such payment; failure to so notify Google shall result in the waiver by You of any claim relating to any such disputed payment. Payment shall be calculated

solely based on records maintained by Google. No other measurements or statistics of any kind shall be accepted by Google or have any effect under this Agreement. The payments made under this Agreement are for use by You only and may not be transferred or in any manner passed on to any third party (i.e., distributed to Properties managed by You that require separate payments) unless expressly authorized in writing by Google (including by electronic mail). From time to time Google may be holding funds, payments and other amounts due to You in connection with the AdSense Program. You acknowledge and agree that Google may, without further notice to You, contribute to a charitable organization selected by Google all funds, payments and other amounts related to the AdSense Program that are held by Google and that are due to you (if any), but which Google is unable to pay or deliver to You because Your account is Inactive (as defined below). "Inactive" means that, based on Google's records: (a) for a period of two (2) years or more You have not logged into your account or accepted funds, payments or other amounts that Google has attempted to pay or deliver to You, and (b) Google has been unable to reach You, or

has not received adequate payment instructions from You, after contacting You at the address shown in Google's records.

12.
Publicity. You agree that Google may use Your name and logo in presentations, marketing materials, customer lists, financial reports, Web site listings of customers, Search Results Pages, and Referral Pages. If You wish to use Google's trade names, trademarks, service marks, logos, domain names, and other distinctive brand features ("Brand Features"), You may do so, so long as such use is in compliance with this Agreement and in compliance with Google's then current Brand Feature use guidelines, and any content contained or referenced therein, which guidelines may be found at the following URL: http://www.google.com/permissions/guidelines.html (or such other URL Google may provide from time to time).

13.
Representations and Warranties. You represent and warrant that (a) all of the information provided by You to Google to enroll in the Program is correct and current; (b) You are the owner of each Property or You are legally authorized to act on behalf of the owner of such Property(ies) for the purposes of this Agreement and the Program; (c) You have all necessary right, power, and authority to enter into this Agreement and to perform the acts required of You hereunder; and (d) You have complied and will continue to comply with all applicable laws, statutes, ordinances, and regulations (including without limitation the CAN-SPAM Act of 2003 and any relevant data protection or privacy laws) in Your performance of any acts hereunder. In addition, to the extent that Your Site is a media player (1) You represent and warrant that You have a valid license to use and distribute such media player (including all content therein, including without limitation any Ads or Ad Units) for the purposes of this Agreement and the Program; and (2) You shall ensure that any media player(s) that constitute the Site shall comply with the terms and conditions set forth herein. You further represent and warrant that each Property and any material displayed therein: (i) comply with all applicable laws, statutes, ordinances, and regulations; (ii) do not breach and have not breached any duty toward or rights of any person or entity including, without limitation, rights of intellectual property, publicity or privacy, or rights or duties under consumer protection, product liability, tort, or contract theories; and (iii) are not pornographic, hate-related or otherwise violent in content.

14.
Your Obligation to Indemnify. You agree to indemnify, defend and hold Google, its agents, affiliates, subsidiaries, directors, officers, employees, and applicable third parties (e.g. relevant advertisers, syndication partners, licensors, licensees, consultants and contractors) (collectively "Indemnified Person(s)") harmless from and against any and all third party claims, liability, loss, and expense (including damage awards, settlement amounts, and reasonable legal fees), brought against any Indemnified Person(s), arising out of, related to or which may arise from Your use of the Program, the Property(ies), and/or Your breach of any term of this Agreement.

15.
Google Rights. You acknowledge that Google owns all right, title and interest, including without limitation all Intellectual Property Rights (as defined below), in and to the Program (including Google's ad serving technology, search technology, referral technology, and Brand Features, including implied licenses, and excluding items licensed by Google from third parties and excluding any third party media player that may comprise the Property), and that You will not

8

acquire any right, title, or interest in or to the Program except as expressly set forth in this Agreement. You will not modify, adapt, translate, prepare derivative works from, decompile, reverse engineer, disassemble or otherwise attempt to derive source code from any Google services, software, or documentation, or create or attempt to create a substitute or similar service or product through use of or access to the Program or proprietary information related thereto. You will not remove, obscure, or alter Google's copyright notice, Brand Features, or other proprietary rights notices affixed to or contained within any Google services, software, or documentation (including without limitation the display of Google's Brand Features with Ads, Links, Search Boxes, Search Results, and/or Referral Buttons, as applicable). "Intellectual Property Rights" means any and all rights existing from time to time under patent law, copyright law, semiconductor chip protection law, moral rights law, trade secret law, trademark law, unfair competition law, publicity rights law, privacy rights law, and any and all other proprietary rights, as well as, any and all applications, renewals, extensions, restorations and re-instatements thereof, now or hereafter in force and effect worldwide.

16.

Information Rights. Google may retain and use, subject to the terms of the Google Privacy Policy (located at http://www.google.com/privacy.html, or such other URL as Google may provide from time to time), all information You provide, including but not limited to Property demographics and contact and billing information. You agree that Google may transfer and disclose to third parties personally identifiable information about You for the purpose of approving and enabling Your participation in the Program, including to third parties that reside in jurisdictions with less restrictive data laws than Your own. Google may also provide information in response to valid legal process, such as subpoenas, search warrants and court orders, or to establish or exercise its legal rights or defend against legal claims. Google disclaims all responsibility, and will not be liable to You, however, for any disclosure of that information by any such third party. Google may share non-personally-identifiable information about You, including Property URLs, Property-specific statistics and similar information collected by Google, with advertisers, business partners, sponsors, and other third parties. In addition, You grant Google the right to access, index and cache the Property(ies), or any portion thereof, including by automated means including Web spiders or crawlers.

17.

Miscellaneous. This Agreement shall be governed by the laws of California, except for its conflicts of laws principles. Any dispute or claim arising out of or in connection with this Agreement shall be adjudicated in Santa Clara County, California. The parties specifically exclude from application to the Agreement the United Nations Convention on Contracts for the International Sale of Goods and the Uniform Computer Information Transactions Act. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof. Any modifications to this Agreement must be made in a writing executed by both parties, by Your online acceptance of updated terms, or after Your continued participation in the Program after such terms have been updated by Google. The failure to require performance of any provision shall not affect a party's right to require performance at any time thereafter, nor shall a waiver of any breach or default of this Agreement constitute a waiver of any subsequent breach or default or a waiver of the provision itself. If any provision herein is held unenforceable, then such provision will be modified to reflect the parties' intention, and the remaining provisions of this Agreement will remain in full force and effect. You may not resell,

assign, or transfer any of Your rights hereunder. Any such attempt may result in termination of this Agreement, without liability to Google. Notwithstanding the foregoing, Google may assign this Agreement to any affiliate at any time without notice. The relationship between Google and You is not one of a legal partnership relationship, but is one of independent contractors.

2008-02-25

*Exhibit C*

| Site | Page views | Clicks | Page CTR | CPC (USD) | Page RPM | Estimated earnings (USD) |
|---|---|---|---|---|---|---|
| thebestinvestmentnewsletters.com | 329476 | 13896 | 4.22% | 1.13 | 47.65 | 15700.89 |
| powertools1.isb2.net | 306236 | 11561 | 3.78% | 1.13 | 42.76 | 13093.84 |
| personalinjurylawyers1.isb2.net | 404229 | 7069 | 1.75% | 1.47 | 25.63 | 10360.4 |
| investmentnewsletters1.isb2.net | 178629 | 8187 | 4.58% | 1.2 | 54.84 | 9795.48 |
| skincancer1.isb2.net | 174326 | 4298 | 2.47% | 0.98 | 24.05 | 4191.85 |
| hawaiitravel1.isb2.net | 227931 | 4140 | 1.82% | 0.98 | 17.72 | 4039.42 |
| consolesofratable1.isb2.net | 140792 | 3051 | 2.17% | 1.05 | 22.81 | 3211.35 |
| yourtaxpreparation1.isb2.net | 105403 | 1114 | 1.06% | 1.73 | 18.3 | 1928.84 |
| decks13.isb2.net | 102989 | 1288 | 1.25% | 1.48 | 18.56 | 1911.68 |
| goldinvestments1.isb2.net | 133030 | 1892 | 1.42% | 0.94 | 13.32 | 1771.8 |
| folkirish1.isb2.net | 75135 | 1293 | 1.72% | 1.02 | 17.52 | 1316.74 |
| coloncancer1.isb2.net | 189025 | 1369 | 0.72% | 0.8 | 5.82 | 1099.4 |
| bedbugs1.isb2.net | 77469 | 827 | 1.07% | 1.32 | 14.06 | 1088.84 |
| candy1.isb2.net | 127841 | 1217 | 0.95% | 0.81 | 7.73 | 988.3 |
| www.ineedfinancialhelp.net | 133265 | 1159 | 0.87% | 0.85 | 7.4 | 986.57 |
| giftcards1.isb2.net | 97783 | 1189 | 1.22% | 0.81 | 9.89 | 966.77 |
| fruitsmoothies1.isb2.net | 56144 | 981 | 1.75% | 0.96 | 16.81 | 943.94 |
| insects1.isb2.net | 84299 | 790 | 0.94% | 1.1 | 10.33 | 870.57 |
| gasgrills1.isb2.net | 92366 | 696 | 0.75% | 1.15 | 8.65 | 798.86 |
| diabetestreatment1.isb2.net | 135648 | 999 | 0.74% | 0.79 | 5.83 | 790.21 |
| badhabits1.isb2.net | 51219 | 617 | 1.20% | 1.27 | 15.25 | 781.34 |
| manhattanshopping1.isb2.net | 66835 | 821 | 1.23% | 0.91 | 11.12 | 743.24 |
| vitaminsminerals1.isb2.net | 72133 | 549 | 0.76% | 1.01 | 7.71 | 556.5 |
| ineedfinancialhelp.net | 25985 | 403 | 1.55% | 0.98 | 15.16 | 393.96 |
| purchasesilver1.isb2.net | 60135 | 448 | 0.74% | 0.86 | 6.43 | 386.53 |
| fashiontops1.isb2.net | 27982 | 438 | 1.57% | 0.79 | 12.38 | 346.5 |
| www.blackcargopants1.isb2.net | 70684 | 390 | 0.55% | 0.81 | 4.48 | 316.52 |
| carolinafurniture1.isb2.net | 85755 | 328 | 0.38% | 0.94 | 3.58 | 306.77 |
| ovariancancer1.isb2.net | 32564 | 256 | 0.79% | 1.14 | 8.95 | 291.34 |
| vegan1.isb2.net | 27963 | 269 | 0.96% | 0.78 | 7.53 | 210.51 |
| mediterraneancruises1.isb2.net | 7654 | 188 | 2.46% | 1.06 | 25.92 | 198.41 |
| chicagofood1.isb2.net | 24152 | 119 | 0.49% | 1.37 | 6.77 | 163.55 |
| lasvegashotels1.isb2.net | 8389 | 160 | 1.91% | 0.97 | 18.54 | 155.56 |

| | | | | | | |
|---|---|---|---|---|---|---|
| soccerequipment1.isb2.net | 39406 | 252 | 0.64% | 0.56 | 3.6 | 141.94 |
| divorce1.isb2.net | 3320 | 56 | 1.69% | 1.91 | 32.23 | 107.02 |
| acne113.isb2.net | 8635 | 89 | 1.03% | 1.11 | 11.43 | 98.72 |
| washingtondc113.isb2.net | 2641 | 79 | 2.99% | 1.02 | 30.51 | 80.58 |
| glutenfree1.isb2.net | 10186 | 94 | 0.92% | 0.77 | 7.15 | 72.84 |
| jewish1.isb2.net | 11268 | 63 | 0.56% | 0.98 | 5.47 | 61.59 |
| western-belt-buckle.net | 10190 | 134 | 1.32% | 0.46 | 6.01 | 61.28 |
| www.eyeglasses-world-online.com | 6558 | 113 | 1.72% | 0.52 | 8.88 | 58.24 |
| bransonhotels1.isb2.net | 424 | 33 | 7.78% | 1.54 | 50.82 | 119.86 |
| kindleclabes1.isb2.net | 14202 | 69 | 0.49% | 0.73 | 3.54 | 50.3 |
| horoscope113.isb2.net | 2849 | 41 | 1.44% | 1.12 | 16.1 | 45.87 |
| mothersday113.isb2.net | 11506 | 42 | 0.37% | 0.98 | 3.56 | 40.97 |
| attorneysdoctorerror1.isb2.net | 15025 | 33 | 0.22% | 1.06 | 2.33 | 35.03 |
| baseballequipment1.isb2.net | 9804 | 70 | 0.71% | 0.48 | 3.43 | 33.64 |
| bransonmissouri1.isb2.net | 5893 | 32 | 0.54% | 1.05 | 5.69 | 33.53 |
| losangeleshotels1.isb2.net | 4139 | 28 | 0.68% | 1.06 | 7.16 | 29.64 |
| horoscope1.isb2.net | 2828 | 23 | 0.81% | 0.88 | 7.14 | 20.19 |
| israeltravel1.isb2.net | 2385 | 15 | 0.63% | 1 | 6.27 | 14.95 |
| learnchinese11362.isb2.net | 374 | 10 | 2.67% | 0.91 | 24.29 | 9.08 |
| easymoney113.isb2.net | 3738 | 9 | 0.24% | 0.62 | 1.49 | 5.56 |
| Web caches and other | 371 | 4 | 1.08% | 0.14 | 1.52 | 0.56 |
| test.ineedfinancialhelp.net | 48 | 1 | 2.08% | 0.13 | 2.61 | 0.13 |
| 78.159.120.165 | 874 | 0 | 0.00% | | 0.03 | 0.03 |
| 37.59.80.100 | 804 | 0 | 0.00% | | 0.03 | 0.03 |
| topfindit.com | 2741 | 0 | 0.00% | | 0.01 | 0.02 |
| static.ak.facebook.com | 263 | 0 | 0.00% | | 0.09 | 0.02 |
| look-up-90.com | 674 | 0 | 0.00% | | 0.03 | 0.02 |
| www.revsponsor.com | 93 | 0 | 0.00% | | 0.06 | 0.01 |
| www.nyc212.net | 14 | 0 | 0.00% | | 0.92 | 0.01 |
| www.bbcseek.com | 696 | 0 | 0.00% | | 0.02 | 0.01 |
| waybeyondcompare.com | 513 | 0 | 0.00% | | 0.02 | 0.01 |
| rentbuynow.com | 1120 | 0 | 0.00% | | 0.01 | 0.01 |
| find-abc.com | 898 | 0 | 0.00% | | 0.01 | 0.01 |
| zzzui.com | 1 | 0 | 0.00% | | 0 | 0 |

| Website | Count | | | | |
|---|---|---|---|---|---|
| zodiac-psychic.com | 1 | 0 | 0.00% | 0 | 0 |
| yoursearchsite.com | 9 | 0 | 0.00% | 0.11 | 0 |
| yourmoney.msn.com | 2 | 0 | 0.00% | 0 | 0 |
| xmllistings.com | 25 | 0 | 0.00% | 0 | 0 |
| xclits.com | 12 | 0 | 0.00% | 0 | 0 |
| www.zigglesearch.com | 567 | 0 | 0.00% | 0 | 0 |
| www.youtube.com | 6 | 0 | 0.00% | 0 | 0 |
| www.yoursearchsite.com | 40 | 0 | 0.00% | 0 | 0 |
| www.ynetnews.com | 3 | 0 | 0.00% | 0 | 0 |
| www.ynet.co.il | 20 | 0 | 0.00% | 0 | 0 |
| www.yatra.com | 1 | 0 | 0.00% | 0 | 0 |
| www.xmllistings.com | 85 | 0 | 0.00% | 0.04 | 0 |
| www.windsorstore.com | 1 | 0 | 0.00% | 0 | 0 |
| www.whowhatwear.com | 2 | 0 | 0.00% | 0 | 0 |
| www.whiteboardsearch.com | 1 | 0 | 0.00% | 0 | 0 |
| www.westernunion.com | 1 | 0 | 0.00% | 0 | 0 |
| www.walmart.com | 1 | 0 | 0.00% | 0 | 0 |
| www.voxsearches.com | 2 | 0 | 0.00% | 0.18 | 0 |
| www.vitamincottage.com | 1 | 0 | 0.00% | 0 | 0 |
| www.venus.com | 2 | 0 | 0.00% | 0 | 0 |
| www.validwin.com | 1 | 0 | 0.00% | 0 | 0 |
| www.validguard.com | 20 | 0 | 0.00% | 0 | 0 |
| www.vacationstogo.com | 14 | 0 | 0.00% | 0 | 0 |
| www.usatoday.idmanagedsolutions.com | 1 | 0 | 0.00% | 0 | 0 |
| www.unitedmedicalcredit.com | 1 | 0 | 0.00% | 0 | 0 |
| www.twentysearch.com | 1 | 0 | 0.00% | 0 | 0 |
| www.turbotax.com | 2 | 0 | 0.00% | 0.01 | 0 |
| www.tripadvisor.com | 1 | 0 | 0.00% | 0 | 0 |
| www.trekmedia.net | 29 | 0 | 0.00% | 0.01 | 0 |
| www.tradestead.com | 1 | 0 | 0.00% | 0 | 0 |
| www.toolking.com | 1 | 0 | 0.00% | 0 | 0 |
| www.theyeshivaworld.com | 1 | 0 | 0.00% | 0 | 0 |
| www.thewoodenchair.com | 1 | 0 | 0.00% | 0 | 0 |
| www.thestreet.com | 1 | 0 | 0.00% | 0.01 | 0 |

| Website | | | | | |
|---|---|---|---|---|---|
| www.thedoctorsofficescv.com | 1 | 0 | 0.00% | 0 | 0 |
| www.thebestinvestmentnewsletters.cor | 2 | 0 | 0.00% | 0 | 0 |
| www.taxslayer.com | 2 | 0 | 0.00% | 0 | 0 |
| www.taringa.net | 1 | 0 | 0.00% | 0 | 0 |
| www.streetmoda.com | 1 | 0 | 0.00% | 0 | 0 |
| www.spreadshirt.com | 1 | 0 | 0.00% | 0 | 0 |
| www.sothebyshomes.com | 1 | 0 | 0.00% | 0 | 0 |
| www.socceramerica.com | 1 | 0 | 0.00% | 0 | 0 |
| www.snapsearches.com | 1 | 0 | 0.00% | 0 | 0 |
| www.snapon.com | 1 | 0 | 0.00% | 0 | 0 |
| www.smashwords.com | 1 | 0 | 0.00% | 0 | 0 |
| www.sm2n.com | 2 | 0 | 0.00% | 0 | 0 |
| www.siliconfix.com | 1 | 0 | 0.00% | 0 | 0 |
| www.sharpabdominalpain.com | 1 | 0 | 0.00% | 0 | 0 |
| www.shahspecialityhospital.com | 1 | 0 | 0.00% | 0 | 0 |
| www.seekersearching.com | 77 | 0 | 0.00% | 0.01 | 0 |
| www.seekerquest.com | 74 | 0 | 0.00% | 0.02 | 0 |
| www.searchxpansion.com | 59 | 0 | 0.00% | 0.01 | 0 |
| www.searchornet.com | 1 | 0 | 0.00% | 0 | 0 |
| www.searchcreek.com | 1 | 0 | 0.00% | 0 | 0 |
| www.searchcpv.com | 54 | 0 | 0.00% | 0.01 | 0 |
| www.rosario3.com | 1 | 0 | 0.00% | 0.25 | 0 |
| www.roomstogo.com | 1 | 0 | 0.00% | 0 | 0 |
| www.roblox.com | 1 | 0 | 0.00% | 0 | 0 |
| www.roamans.com | 1 | 0 | 0.00% | 0 | 0 |
| www.riverplate.com | 1 | 0 | 0.00% | 0 | 0 |
| www.rivalgaming.com | 2 | 0 | 0.00% | 0.01 | 0 |
| www.rediff.com | 4 | 0 | 0.00% | 0 | 0 |
| www.quicksearchwizard.com | 1 | 0 | 0.00% | 0 | 0 |
| www.querystuff.com | 1 | 0 | 0.00% | 0 | 0 |
| www.propertyroom.com | 1 | 0 | 0.00% | 0 | 0 |
| www.playhub.com | 1 | 0 | 0.00% | 0 | 0 |
| www.pinkyarcade.com | 1 | 0 | 0.00% | 0 | 0 |
| www.parkingpremium.com | 58 | 0 | 0.00% | 0.03 | 0 |
| www.panet.co.il | 46 | 0 | 0.00% | 0 | 0 |

| URL | Count | | Percent | | |
|---|---|---|---|---|---|
| www.pancharmbracelets.com | 1 | 0 | 0.00% | 0 | |
| www.opticalseeking.com | 55 | 0 | 0.00% | 0.01 | |
| www.ono.es | 1 | 0 | 0.00% | 0 | |
| www.onestopplus.com | 2 | 0 | 0.00% | 0 | |
| www.onemorelevel.com | 1 | 0 | 0.00% | 0 | |
| www.nyandcompany.com | 1 | 0 | 0.00% | 0 | |
| www.nuevayork.net | 1 | 0 | 0.00% | 0 | |
| www.notdoppler.com | 12 | 0 | 0.00% | 0.01 | |
| www.nick.com | 1 | 0 | 0.00% | 0 | |
| www.netsearch.cc | 3 | 0 | 0.00% | 0 | |
| www.myprivatesearch.com | 52 | 0 | 0.00% | 0.01 | 0 |
| www.myclickfind.com | 22 | 0 | 0.00% | 0.01 | |
| www.mundodeportivo.com | 1 | 0 | 0.00% | 0 | |
| www.msnbc.msn.com | 1 | 0 | 0.00% | 0 | |
| www.mothersdaycelebration.com | 1 | 0 | 0.00% | 0 | |
| www.mostfungames.com | 1 | 0 | 0.00% | 0 | |
| www.monmouthmedicalgroup.com | 1 | 0 | 0.00% | 0 | |
| www.moneycontrol.com | 1 | 0 | 0.00% | 0 | |
| www.monex.com | 1 | 0 | 0.00% | 0 | |
| www.mochigames.com | 2 | 0 | 0.00% | 0 | |
| www.missouriluvscompany.com | 1 | 0 | 0.00% | 0 | |
| www.missingmoney.com | 2 | 0 | 0.00% | 0 | |
| www.mibebu.com | 1 | 0 | 0.00% | 0.01 | |
| www.maximumfindings.com | 76 | 0 | 0.00% | 0.04 | |
| www.mathrubhumi.com | 1 | 0 | 0.00% | 0 | |
| www.lv.com | 1 | 0 | 0.00% | 0 | |
| www.ltdcommodities.com | 1 | 0 | 0.00% | 0 | |
| www.lotion4you.com | 1 | 0 | 0.00% | 0 | |
| www.losarcanos.com | 1 | 0 | 0.00% | 0 | |
| www.lonelyplanet.com | 4 | 0 | 0.00% | 0 | |
| www.logcabinhomes.com | 1 | 0 | 0.00% | 0 | |
| www.livemint.com | 1 | 0 | 0.00% | 0 | |
| www.lebanonfiles.com | 2 | 0 | 0.00% | 0 | |
| www.lanebryant.com | 1 | 0 | 0.00% | 0 | |

| | | | |
|---|---|---|---|
| www.king.com | 2 | 0 | 0.00% | 0 | 0 |
| www.juegosgratis.tv | 1 | 0 | 0.00% | 0 | 0 |
| www.johnhancock.com | 1 | 0 | 0.00% | 0 | 0 |
| www.johnchow.com | 1 | 0 | 0.00% | 0 | 0 |
| www.jessicalondon.com | 1 | 0 | 0.00% | 0.54 | 0 |
| www.jcpenney.com | 1 | 0 | 0.00% | 0 | 0 |
| www.investorsgroup.com | 2 | 0 | 0.00% | 0 | 0 |
| www.investopedia.com | 3 | 0 | 0.00% | 0 | 0 |
| www.insidetexas.com | 1 | 0 | 0.00% | 0 | 0 |
| www.ingdirect.com | 1 | 0 | 0.00% | 0.01 | 0 |
| www.infobae.com | 2 | 0 | 0.00% | 0 | 0 |
| www.incredimail.com | 1 | 0 | 0.00% | 0 | 0 |
| www.incomecpv.com | 56 | 0 | 0.00% | 0.08 | 0 |
| www.incesukozmetik.com.tr | 1 | 0 | 0.00% | 0 | 0 |
| www.ikea.com | 3 | 0 | 0.00% | 0 | 0 |
| www.ifindsee.com | 27 | 0 | 0.00% | 0.01 | 0 |
| www.ifate.com | 1 | 0 | 0.00% | 0 | 0 |
| www.idisearch.com | 23 | 0 | 0.00% | 0.03 | 0 |
| www.ice.com | 1 | 0 | 0.00% | 0 | 0 |
| www.hyperfind.net | 569 | 0 | 0.00% | 0.01 | 0 |
| www.hsn.com | 1 | 0 | 0.00% | 0 | 0 |
| www.hrblock.com | 2 | 0 | 0.00% | 0 | 0 |
| www.homeinsuranceoffers.com | 77 | 0 | 0.00% | 0.01 | 0 |
| www.hollisterco.com | 1 | 0 | 0.00% | 0 | 0 |
| www.hnvgamz.com | 1 | 0 | 0.00% | 0 | 0 |
| www.hindustantimes.com | 1 | 0 | 0.00% | 0 | 0 |
| www.hatland.com | 1 | 0 | 0.00% | 0 | 0 |
| www.haaretz.com | 4 | 0 | 0.00% | 0 | 0 |
| www.gourmandia.ca | 1 | 0 | 0.00% | 0 | 0 |
| www.godiva.com | 1 | 0 | 0.00% | 0 | 0 |
| www.gifts.com | 1 | 0 | 0.00% | 0 | 0 |
| www.gardensalive.com | 1 | 0 | 0.00% | 0 | 0 |
| www.games.com | 2 | 0 | 0.00% | 0 | 0 |
| www.games-jogos.com | 2 | 0 | 0.00% | 0.08 | 0 |

| Website | Count | | % | | |
|---|---|---|---|---|---|
| www.futbolplus.com | 1 | 0 | 0.00% | 0 | 0 |
| www.furniturenation.com | 1 | 0 | 0.00% | 0 | 0 |
| www.forexpros.com | 6 | 0 | 0.00% | 0 | 0 |
| www.forever21.com | 3 | 0 | 0.00% | 0.15 | 0 |
| www.forbes.com | 1 | 0 | 0.00% | 0 | 0 |
| www.footprintsit.com | 6 | 0 | 0.00% | 0 | 0 |
| www.findpalace.com | 1 | 0 | 0.00% | 0 | 0 |
| www.findant.com | 1 | 0 | 0.00% | 0 | 0 |
| www.fi.com | 2 | 0 | 0.00% | 0 | 0 |
| www.farmers.com | 1 | 0 | 0.00% | 0 | 0 |
| www.fandango.com | 1 | 0 | 0.00% | 0 | 0 |
| www.eyou8989.com | 1 | 0 | 0.00% | 0 | 0 |
| www.expandedsearch.net | 1 | 0 | 0.00% | 0 | 0 |
| www.examiner.com | 1 | 0 | 0.00% | 0 | 0 |
| www.everydayhealth.com | 1 | 0 | 0.00% | 0 | 0 |
| www.espnstar.com | 1 | 0 | 0.00% | 0 | 0 |
| www.epicplay.com | 3 | 0 | 0.00% | 0.02 | 0 |
| www.elciudadanoweb.com | 1 | 0 | 0.00% | 0.01 | 0 |
| www.eddiebauer.com | 1 | 0 | 0.00% | 0 | 0 |
| www.drugandddisease.com | 1 | 0 | 0.00% | 0 | 0 |
| www.deluxegiftcard.com | 1 | 0 | 0.00% | 0 | 0 |
| www.dailyfreegames.com | 2 | 0 | 0.00% | 0 | 0 |
| www.crawlerexpert.com | 1 | 0 | 0.00% | 0 | 0 |
| www.crawlercity.com | 1 | 0 | 0.00% | 0 | 0 |
| www.cpvxspansion.com | 27 | 0 | 0.00% | 0 | 0 |
| www.cpvstream.com | 53 | 0 | 0.00% | 0 | 0 |
| www.cpvsponsor.com | 92 | 0 | 0.00% | 0.01 | 0 |
| www.cpvparking.com | 21 | 0 | 0.00% | 0.01 | 0 |
| www.cpvlistings.com | 30 | 0 | 0.00% | 0.07 | 0 |
| www.cpvconverts.com | 45 | 0 | 0.00% | 0.07 | 0 |
| www.cpvconverts.com | 48 | 0 | 0.00% | 0.01 | 0 |
| www.cpvadverts.com | 61 | 0 | 0.00% | 0.03 | 0 |
| www.cpvads.net | 1 | 0 | 0.00% | 0.02 | 0 |
| www.costco.com | 1 | 0 | 0.00% | 0.02 | 0 |
| www.costco.ca | 1 | 0 | 0.00% | 0 | 0 |

| Website | | | | | |
|---|---|---|---|---|---|
| www.console-sofa-table.com | 2 | 0 | 0.00% | 0 | 0 |
| www.commonlistings.com | 26 | 0 | 0.00% | 0.01 | 0 |
| www.combatsearch.com | 1 | 0 | 0.00% | 0 | 0 |
| www.coinflation.com | 2 | 0 | 0.00% | 0 | 0 |
| www.cnbc.com | 4 | 0 | 0.00% | 0.03 | 0 |
| www.clicksall.com | 14 | 0 | 0.00% | 0 | 0 |
| www.cjbanks.com | 1 | 0 | 0.00% | 0 | 0 |
| www.citybizlist.com | 1 | 0 | 0.00% | 0 | 0 |
| www.chicagoeats.info | 16 | 0 | 0.00% | 0.13 | 0 |
| www.chanel.com | 1 | 0 | 0.00% | 0 | 0 |
| www.cartoonnetwork.com | 1 | 0 | 0.00% | 0 | 0 |
| www.buzzsearches.com | 1 | 0 | 0.00% | 0 | 0 |
| www.businessenhanced.com | 82 | 0 | 0.00% | 0.01 | 0 |
| www.booking.com | 1 | 0 | 0.00% | 0 | 0 |
| www.bodyc.com | 1 | 0 | 0.00% | 0 | 0 |
| www.bodogle.com | 1 | 0 | 0.00% | 0 | 0 |
| www.bobpaulrarecoins.com | 1 | 0 | 0.00% | 0 | 0 |
| www.bmoinvestorline.com | 1 | 0 | 0.00% | 0 | 0 |
| www.bloomberg.com | 2 | 0 | 0.00% | 1.76 | 0 |
| www.bigsoccer.com | 1 | 0 | 0.00% | 0 | 0 |
| www.bestbuy.com | 1 | 0 | 0.00% | 0 | 0 |
| www.bertolli.com | 1 | 0 | 0.00% | 0 | 0 |
| www.bedbathandbeyond.com | 1 | 0 | 0.00% | 0 | 0 |
| www.banks.com | 1 | 0 | 0.00% | 0 | 0 |
| www.baers.com | 1 | 0 | 0.00% | 0 | 0 |
| www.avenue.com | 1 | 0 | 0.00% | 0.02 | 0 |
| www.askagency.com | 2 | 0 | 0.00% | 0 | 0 |
| www.as.com | 3 | 0 | 0.00% | 0 | 0 |
| www.armaniexchange.com | 1 | 0 | 0.00% | 0 | 0 |
| www.apmex.com | 4 | 0 | 0.00% | 0 | 0 |
| www.allstate.com | 1 | 0 | 0.00% | 0 | 0 |
| www.alicart.com | 1 | 0 | 0.00% | 0 | 0 |
| www.agame.com | 3 | 0 | 0.00% | 0.06 | 0 |
| www.advertisingenhanced.com | 74 | 0 | 0.00% | 0.01 | 0 |

| Domain | Count | | | | |
|---|---|---|---|---|---|
| www.addictinggames.com | 2 | 0 | 0.00% | 0 | 0 |
| www.actionallstars.com | 1 | 0 | 0.00% | 0 | 0 |
| www.abercrombie.com | 1 | 0 | 0.00% | 0 | 0 |
| www.abercrombie.ca | 1 | 0 | 0.00% | 0 | 0 |
| www.9down.com | 1 | 0 | 0.00% | 0 | 0 |
| www.511tactical.com | 1 | 0 | 0.00% | 0 | 0 |
| www.360search.net | 57 | 0 | 0.00% | 0.01 | 0 |
| washingtondeecee113.isb2.net | 1 | 0 | 0.00% | 0 | 0 |
| uspresidents1.isb2.net | 1 | 0 | 0.00% | 0 | 0 |
| usnewsplace.com | 1 | 0 | 0.00% | 0 | 0 |
| usedcars.kbb.com | 1 | 0 | 0.00% | 0 | 0 |
| uk.soccerway.com | 1 | 0 | 0.00% | 0 | 0 |
| tvkraze.com | 1 | 0 | 0.00% | 0 | 0 |
| turbotax.intuit.com | 15 | 0 | 0.00% | 0.1 | 0 |
| tuc0sports.blogspot.com.es | 1 | 0 | 0.00% | 0 | 0 |
| traffstar.com | 1 | 0 | 0.00% | 0 | 0 |
| tradometal.com | 11 | 0 | 0.00% | 0 | 0 |
| timesbestsellers1.isb2.net | 4 | 0 | 0.00% | 0 | 0 |
| tiebuilder.com | 88 | 0 | 0.00% | 0 | 0 |
| theskirt561.isb2.net | 1 | 0 | 0.00% | 0 | 0 |
| themininext.com | 15 | 0 | 0.00% | 0.01 | 0 |
| thegadgetchannel.com | 20 | 0 | 0.00% | 0.01 | 0 |
| texas.rivals.com | 1 | 0 | 0.00% | 0 | 0 |
| telugu.way2movies.com | 1 | 0 | 0.00% | 0 | 0 |
| talkcol.net | 3 | 0 | 0.00% | 0 | 0 |
| takez.net | 10 | 0 | 0.00% | 0.01 | 0 |
| symptoms.webmd.com | 1 | 0 | 0.00% | 0 | 0 |
| sunnyawara.com | 1 | 0 | 0.00% | 0 | 0 |
| store.alloy.com | 1 | 0 | 0.00% | 0 | 0 |
| staterbros.com | 1 | 0 | 0.00% | 0 | 0 |
| sonsi.lanebryant.com | 1 | 0 | 0.00% | 0 | 0 |
| shopping-centres.org | 3 | 0 | 0.00% | 0.01 | 0 |
| shop.lonelyplanet.com | 1 | 0 | 0.00% | 0.05 | 0 |
| shop.i-r-g.com | 1 | 0 | 0.00% | 0 | 0 |

| Domain | | | | | |
|---|---|---|---|---|---|
| serw.clicksor.com | 28 | 0 | 0.00% | 0.02 | 0 |
| server8.kproxy.com | 1 | 0 | 0.00% | 0 | 0 |
| server1.kproxy.com | 1 | 0 | 0.00% | 0 | 0 |
| sendanswer.com | 1 | 0 | 0.00% | 0 | 0 |
| seemore24.com | 2 | 0 | 0.00% | 0 | 0 |
| seekersearching.com | 16 | 0 | 0.00% | 0 | 0 |
| seekersearching.com | 30 | 0 | 0.00% | 0 | 0 |
| seekerquest.com | 9 | 0 | 0.00% | 0 | 0 |
| searchxpansion.com | 105 | 0 | 0.00% | 0.41 | 0 |
| searchmshopping.com | 12 | 0 | 0.00% | 0.01 | 0 |
| searchcpv.com | 1 | 0 | 0.00% | 0.02 | 0 |
| search.zero-seek.com | 2 | 0 | 0.00% | 0 | 0 |
| search.yourgreatsearch.com | 3 | 0 | 0.00% | 0 | 0 |
| search.yourgoodsearch.com | 1 | 0 | 0.00% | 0 | 0 |
| search.upperadvertiser.com | 1 | 0 | 0.00% | 0 | 0 |
| search.seek-refuge.com | 1 | 0 | 0.00% | 0 | 0 |
| search.seek-more.com | 1 | 0 | 0.00% | 0 | 0 |
| search.seek-media.com | 1 | 0 | 0.00% | 0 | 0 |
| search.seek-knock.com | 1 | 0 | 0.00% | 0 | 0 |
| search.search-example.com | 1 | 0 | 0.00% | 0 | 0 |
| search.scarletseek.com | 1 | 0 | 0.00% | 0 | 0 |
| search.sadsearch.com | 1 | 0 | 0.00% | 0 | 0 |
| search.rubyredseek.com | 1 | 0 | 0.00% | 0 | 0 |
| search.redseekmedia.com | 3 | 0 | 0.00% | 0 | 0 |
| search.quickeasysearch.com | 2 | 0 | 0.00% | 0.28 | 0 |
| search.perfectsearchengines.com | 1 | 0 | 0.00% | 0 | 0 |
| search.perfectsearchengine.com | 1 | 0 | 0.00% | 0.12 | 0 |
| search.madeaeasysearch.com | 4 | 0 | 0.00% | 0 | 0 |
| search.littleredseek.com | 1 | 0 | 0.00% | 0 | 0 |
| search.littlegreenfind.com | 1 | 0 | 0.00% | 0 | 0 |
| search.littlebluesearch.com | 1 | 0 | 0.00% | 0 | 0 |
| search.indigo-search.com | 1 | 0 | 0.00% | 0 | 0 |
| search.hot-find.com | 1 | 0 | 0.00% | 0 | 0 |
| search.greatsearchsolutions.com | 1 | 0 | 0.00% | 0 | 0 |
| search.greatestsearchresults.com | 2 | 0 | 0.00% | 0 | 0 |

| Domain | | | | | |
|---|---|---|---|---|---|
| search.goinggreenfind.com | 1 | 0 | 0.00% | 0 | 0 |
| search.find-green.com | 1 | 0 | 0.00% | 0 | 0 |
| search.find-great.com | 1 | 0 | 0.00% | 0 | 0 |
| search.ezsearchresults.com | 3 | 0 | 0.00% | 2.22 | 0 |
| search.easysearchsite.com | 2 | 0 | 0.00% | 0 | 0 |
| search.come-find.com | 2 | 0 | 0.00% | 0 | 0 |
| search.cleangreenfind.com | 2 | 0 | 0.00% | 0 | 0 |
| search.cherryseek.com | 2 | 0 | 0.00% | 0 | 0 |
| search.cherrysearch.com | 2 | 0 | 0.00% | 0 | 0 |
| search.boom-find.com | 1 | 0 | 0.00% | 0 | 0 |
| search.bluesearchtool.com | 2 | 0 | 0.00% | 0 | 0 |
| search.bluesearchsite.com | 2 | 0 | 0.00% | 0.36 | 0 |
| search.bluesearchonline.com | 1 | 0 | 0.00% | 0 | 0 |
| search.bluesearchlocal.com | 1 | 0 | 0.00% | 0 | 0 |
| search.bestneighborhoodsearch.com | 3 | 0 | 0.00% | 0 | 0 |
| search.best-neighborhood-search.com | 1 | 0 | 0.00% | 0 | 0 |
| search.azurefind.com | 1 | 0 | 0.00% | 0 | 0 |
| sales.my03.com | 9 | 0 | 0.00% | 0 | 0 |
| revsponsor.com | 17 | 0 | 0.00% | 0.01 | 0 |
| revisionmaterial.info | 1 | 0 | 0.00% | 0.01 | 0 |
| reviews.cnet.com | 1 | 0 | 0.00% | 0 | 0 |
| retomenu.com | 40 | 0 | 0.00% | 0.01 | 0 |
| resultsz.com | 3 | 0 | 0.00% | 0.01 | 0 |
| resultsz.com | 47 | 0 | 0.00% | 0.02 | 0 |
| resultnemo.com | 1 | 0 | 0.00% | 0 | 0 |
| res.cruisedeals.com | 1 | 0 | 0.00% | 0 | 0 |
| redirect.seodollars.com | 86 | 0 | 0.00% | 0.01 | 0 |
| rawoverview.com | 1 | 0 | 0.00% | 0.01 | 0 |
| puzzles.usatoday.com | 1 | 0 | 0.00% | 0.01 | 0 |
| prom1.isb2.net | 3 | 0 | 0.00% | 0 | 0 |
| progressescape.com | 1 | 0 | 0.00% | 0 | 0 |
| pragcap.com | 1 | 0 | 0.00% | 0 | 0 |
| posresults.net | 1 | 0 | 0.00% | 0 | 0 |
| pornfile.biz | 1 | 0 | 0.00% | 0 | 0 |
| plavideo.com | 2 | 0 | 0.00% | 0 | 0 |

| Domain | Count | % | Col4 | Col5 |
|---|---|---|---|---|
| parkingpremium.com | 12 | 0 | 0.00% | 0.02 | 0 |
| park.xmlcpv.com | 17 | 0 | 0.00% | 0.03 | 0 |
| panet.co.il | 1 | 0 | 0.00% | 0 | 0 |
| p19.ptp163.com | 3 | 0 | 0.00% | 0 | 0 |
| otpofrei.in | 73 | 0 | 0.00% | 0 | 0 |
| optimalroi.info | 3 | 0 | 0.00% | 0 | 0 |
| opticalseeking.com | 13 | 0 | 0.00% | 0.03 | 0 |
| onlineinfoweb.com | 8 | 0 | 0.00% | 0.01 | 0 |
| occupypaton.com | 1 | 0 | 0.00% | 0 | 0 |
| nutrisca.dogswell.com | 1 | 0 | 0.00% | 0 | 0 |
| notdoppler.com | 1 | 0 | 0.00% | 0 | 0 |
| newlinefilm.com | 3 | 0 | 0.00% | 0 | 0 |
| myprivatesearch.com | 1 | 0 | 0.00% | 0 | 0 |
| myclickfind.com | 12 | 0 | 0.00% | 0 | 0 |
| motoring.asiaone.com | 11 | 0 | 0.00% | 0 | 0 |
| mostmetro.com | 1 | 0 | 0.00% | 0 | 0 |
| money.msn.com | 40 | 0 | 0.00% | 0 | 0 |
| moisearch.net | 3 | 0 | 0.00% | 0 | 0 |
| mixedlisting.com | 177 | 0 | 0.00% | 0.01 | 0 |
| mivo.tv | 21 | 0 | 0.00% | 0 | 0 |
| missouriluvscompany.com | 2 | 0 | 0.00% | 0 | 0 |
| misdiagnosisattorneys1.isb2.net | 59 | 0 | 0.00% | 0.04 | 0 |
| misdiagnosis1.isb2.net | 4 | 0 | 0.00% | 0 | 0 |
| mifind.net | 3 | 0 | 0.00% | 0 | 0 |
| menenzyme.com | 1 | 0 | 0.00% | 0 | 0 |
| maximumfindings.com | 97 | 0 | 0.00% | 0.04 | 0 |
| makeupmeadow.net | 14 | 0 | 0.00% | 0 | 0 |
| losangeles1.isb2.net | 1 | 0 | 0.00% | 0 | 0 |
| longwoodsoccer.vicid.net | 4 | 0 | 0.00% | 0 | 0 |
| lokyfind.com | 1 | 0 | 0.00% | 0 | 0 |
| livelive24.net | 2 | 0 | 0.00% | 0 | 0 |
| librista.es | 6 | 0 | 0.00% | 0 | 0 |
| lakegenevawi.com | 1 | 0 | 0.00% | 0 | 0 |
| lajewelryplaza.com | 14 | 0 | 0.00% | 0 | 0 |
| | 1 | 0 | 0.00% | 0 | 0 |

| Domain | Count | | % | | |
|---|---|---|---|---|---|
| knowledgetoaction.co.uk | 1 | 0 | 0.00% | 0 | 0 |
| kloszinc.com | 8 | 0 | 0.00% | 0 | 0 |
| kiloinc.com | 21 | 0 | 0.00% | 0 | 0 |
| jtrcomputer.com | 1 | 0 | 0.00% | 0 | |
| jewelry-essentials.com | 1 | 0 | 0.00% | 0 | |
| independantsearch.com | 1 | 0 | 0.00% | 0 | |
| incsfind.com | 1 | 0 | 0.00% | 0 | |
| incomecpv.com | 16 | 0 | 0.00% | 0 | |
| hyipreference.com | 4 | 0 | 0.00% | 0 | |
| hurryupseach.in | 1 | 0 | 0.00% | 0 | |
| hrblock.com | 1 | 0 | 0.00% | 0 | |
| homeinsuranceoffers.com | 27 | 0 | 0.00% | 0.01 | 0 |
| home.ingdirect.com | 1 | 0 | 0.00% | 0 | |
| health2place.net | 25 | 0 | 0.00% | 0 | |
| health.msn.com | 1 | 0 | 0.00% | 0 | |
| havanaheaven.in | 14 | 0 | 0.00% | 0.03 | 0 |
| gsn.worldwinner.com | 1 | 0 | 0.00% | 0.01 | 0 |
| gr8gluten-free.com | 214 | 0 | 0.00% | 0.01 | 0 |
| gostball.com | 21 | 0 | 0.00% | 0 | |
| gosearchfindfast.in | 2 | 0 | 0.00% | 0 | |
| goldeneaglemagic.blogspot.com | 1 | 0 | 0.00% | 0 | |
| gol.tycsports.com | 2 | 0 | 0.00% | 0.12 | 0 |
| globaltip.net | 18 | 0 | 0.00% | 0 | |
| gam0ver.com | 5 | 0 | 0.00% | 0.08 | 0 |
| gadgets113.isb2.net | 10 | 0 | 0.00% | 0 | |
| findsimle.com | 1 | 0 | 0.00% | 0 | |
| filter.plusfind.net | 1 | 0 | 0.00% | 0 | |
| fashion.tidebuy.com | 1 | 0 | 0.00% | 0 | |
| eyeglasses-world-online.com | 1 | 0 | 0.00% | 0 | |
| expounix.com | 18 | 0 | 0.00% | 0 | |
| english.gmarket.co.kr | 2 | 0 | 0.00% | 0 | |
| dynamic.2dplay.com | 1 | 0 | 0.00% | 0 | |
| duc.avid.com | 1 | 0 | 0.00% | 0 | |
| dresspop.net | 11 | 0 | 0.00% | 0 | 0 |

| Domain | Count | | % | | |
|---|---|---|---|---|---|
| download.programas-hack.com | 1 | 0 | 0.00% | 0 | 0 |
| download.cnet.com | 1 | 0 | 0.00% | 0 | 0 |
| dousearch.net | 1 | 0 | 0.00% | 0 | 0 |
| doneor.com | 1 | 0 | 0.00% | 0 | 0 |
| discountbargain.org | 661 | 0 | 0.00% | 0.01 | 0 |
| dictone.com | 19 | 0 | 0.00% | 0 | 0 |
| dfinded.com | 114 | 0 | 0.00% | 0.02 | 0 |
| dephfind.com | 5 | 0 | 0.00% | 0 | 0 |
| da-gold.com | 1 | 0 | 0.00% | 0 | 0 |
| cpvxspansion.com | 7 | 0 | 0.00% | 0 | 0 |
| cpvstream.com | 14 | 0 | 0.00% | 0 | 0 |
| cpvsponsor.com | 16 | 0 | 0.00% | 0 | 0 |
| cpvparking.com | 8 | 0 | 0.00% | 0 | 0 |
| cpvlistings.com | 10 | 0 | 0.00% | 0.01 | 0 |
| cpvconverts.com | 15 | 0 | 0.00% | 0 | 0 |
| cpvadverts.com | 18 | 0 | 0.00% | 0 | 0 |
| cpvads.net | 8 | 0 | 0.00% | 0 | 0 |
| cpvads.net | 8 | 0 | 0.00% | 0 | 0 |
| counsellingresource.com | 1 | 0 | 0.00% | 0.01 | 0 |
| coolcarworld.com | 458 | 0 | 0.00% | 0.01 | 0 |
| content.icicidirect.com | 2 | 0 | 0.00% | 0 | 0 |
| console-sofa-table.com | 9 | 0 | 0.00% | 0 | 0 |
| commonlistings.com | 10 | 0 | 0.00% | 0 | 0 |
| coloradooutings.com | 1 | 0 | 0.00% | 0 | 0 |
| coins.about.com | 2 | 0 | 0.00% | 0 | 0 |
| clicks.thespecialsearch.com | 49 | 0 | 0.00% | 0.01 | 0 |
| click.game128.com | 6 | 0 | 0.00% | 0.01 | 0 |
| chromejewelry.com | 6 | 0 | 0.00% | 0 | 0 |
| chicagofree.info | 2 | 0 | 0.00% | 0 | 0 |
| chicagoeats.info | 1 | 0 | 0.00% | 0 | 0 |
| cfksoccer.com | 1 | 0 | 0.00% | 0 | 0 |
| certport.net | 1 | 0 | 0.00% | 0 | 0 |
| catherines.lanebryant.com | 2 | 0 | 0.00% | 0 | 0 |
| cancersuits1.isb2.net | 1 | 0 | 0.00% | 0 | 0 |
| cancerlawsuits1.isb2.net | 2 | 0 | 0.00% | 0 | 0 |
| | 1 | | | | |

| | | | |
|---|---|---|---|
| cancerattorneys1.isb2.net | 1 | 0 | 0.00% | 0 | | 0 |
| cancer2Oovarian2Ostage.globalfindclick.r | 1 | 0 | 0.00% | 0 | | 0 |
| cambiatea-adsl-movistaronline.digitalme | 3 | 0 | 0.00% | 0 | | 0 |
| buzzigy.com | 4 | 0 | 0.00% | 0 | | 0 |
| buy1.snapon.com | 2 | 0 | 0.00% | 0 | | 0 |
| businessenhanced.com | 22 | 0 | 0.00% | 0.04 | | 0 |
| blotspot.net | 1 | 0 | 0.00% | 0 | | 0 |
| blackberry5.com | 18 | 0 | 0.00% | 0.01 | | 0 |
| avatarcommunity.net | 1 | 0 | 0.00% | 0 | | 0 |
| avamia.in | 14 | 0 | 0.00% | 0.01 | | 0 |
| auctionwork.net | 19 | 0 | 0.00% | | | 0 |
| armorgames.com | 3 | 0 | 0.00% | 0 | | 0 |
| arcadegogo.com | 3 | 0 | 0.00% | 0 | | 0 |
| approveulike.com | 1 | 0 | 0.00% | 0 | | 0 |
| anothervery.com | 8 | 0 | 0.00% | 0 | | 0 |
| analystcourse.com | 4 | 0 | 0.00% | 0 | | 0 |
| amoreradiantyou.typepad.com | 1 | 0 | 0.00% | 0 | | 0 |
| almericandream.com | 2 | 0 | 0.00% | 0 | | 0 |
| alleshopz.com | 3 | 0 | 0.00% | 0 | | 0 |
| alienlang.com | 6 | 0 | 0.00% | 0 | | 0 |
| alexanderhiggins.com | 1 | 0 | 0.00% | 0 | | 0 |
| airoutwo.com | 1 | 0 | 0.00% | 0 | | 0 |
| advertisingenhanced.com | 20 | 0 | 0.00% | 0 | | 0 |
| admpont.com | 1 | 0 | 0.00% | 0 | | 0 |
| abcsearchfeeds.in | 3 | 0 | 0.00% | 0 | | 0 |
| abcnews-go.com | 1 | 0 | 0.00% | 0 | | 0 |
| abcnews.go.com | 1 | 0 | 0.00% | 0 | | 0 |
| a98.abzhu.com | 1 | 0 | 0.00% | 0 | | 0 |
| a97.abzhu.com | 1 | 0 | 0.00% | 0 | | 0 |
| a96.abzhu.com | 5 | 0 | 0.00% | 0 | | 0 |
| a93.abzhu.com | 1 | 0 | 0.00% | 0 | | 0 |
| a92.abzhu.com | 82 | 0 | 0.00% | 0.03 | | 0 |
| a91.abzhu.com | 317 | 0 | 0.00% | 0.01 | | 0 |
| a89.abzhu.com | 1 | 0 | 0.00% | 0 | | 0 |
| a86.abzhu.com | 9 | 0 | 0.00% | 0 | | 0 |

| | | | | | |
|---|---|---|---|---|---|
| 78.159.119.90 | 158 | 0 | 0.00% | 0 | 0 |
| 74.6.238.254 | 11 | 0 | 0.00% | 0.14 | 0 |
| 67.201.36.10 | 29 | 0 | 0.00% | 0.04 | 0 |
| 360search.net | 10 | 0 | 0.00% | 0 | 0 |
| 23702.1219.filter2.conductsearch.com | 1 | 0 | 0.00% | 0 | 0 |
| 23015.60908.hit38.namiflow.com | 1 | 0 | 0.00% | 0 | 0 |
| 22567.filter.blutonicsearch.com | 1 | 0 | 0.00% | 0 | 0 |
| 22520.22567.filter.hubnetmedia.com | 1 | 0 | 0.00% | 0 | 0 |
| 21305.18276.filter2.conductsearch.com | 2 | 0 | 0.00% | 0 | 0 |
| 208.116.46.157 | 1 | 0 | 0.00% | 0 | 0 |
| 19369.792.filter.danarimedia.com | 1 | 0 | 0.00% | 0 | 0 |
| 19172.30337.filter2.conductsearch.com | 104 | 0 | 0.00% | 0.01 | 0 |
| 19172.25954.filter2.conductsearch.com | 27 | 0 | 0.00% | 0 | 0 |
| 19172.23833.filter2.conductsearch.com | 213 | 0 | 0.00% | 0 | 0 |
| 19172.18435.filter2.conductsearch.com | 1 | 0 | 0.00% | 0 | 0 |
| 109.235.49.168 | 1 | 0 | 0.00% | 0 | 0 |
| 108.59.9.20 | 1 | 0 | 0.00% | 0 | 0 |

*Exhibit D*

-----Original Message-----
From: Brian Nowell<briann@t324.com>
To: cragottli<cragottli@aol.com>; davidd<davidd@t324.com>
Sent: Tue, May 29, 2012 5:23 pm
Subject: T324 Case Created #11454 - Adsense Account Disabled

**Thank you for contacting T324 Support**
Your request for assistance has been received. Thank you for bringing this to our attention.

Your Support Case is #11454 - Adsense Account Disabled.

Craig,
I'm opening up this case regarding your Adsense issues. There's definitely a problem here.
We received this email from Google on Sunday evening:
------------------------------------------------------------
Subject:  Google AdSense Account Disabled
Hello Gimmegelt,
While going through our records recently, we found that your AdSense account has posed a
significant risk to our AdWords advertisers. Since keeping your account in our publisher
network may financially damage our advertisers in the future, we've decided to disable your
account.
Please understand that we consider this a necessary step to protect the interests of both our
advertisers and our other AdSense publishers. We realize the inconvenience this may cause
you, and we thank you in advance for your understanding and cooperation.
If you have any questions about your account or the actions we've taken, please do not
reply to this email. You can find more information by visiting
https://www.google.com/adsense/support/bin/answer.py?answer=57153&hl=en_US.
Sincerely,
The Google AdSense Team
This message was sent from a notification-only email address that does not accept incoming
email. Please do not reply to this message.
------------------------------------------------------------
I don't know what they mean by 'posing a significant risk to their adwords advertisers' but I
will do my best to investigate.  I know you said you'd like to contact Google directly, but
this unfortunately is virtually impossible.  They're notoriously difficult to reach directly in
any way.
I know what a big issue this is for you and I will do everything I can to try to remedy this
situation.  However, this is bad news... Google is pretty stubborn once they've made a
decision like this and it may be that we're never able to get them to reverse their actions.
I will look into this problem as soon as I can and try my best to get a more detailed
response out of Google.
Give me a call if you have questions or any additional info you think might be helpful as I
dig into this.
Thanks Craig!
-Brian Nowell
Senior Technology Consultant
T324, Inc.
510-525-9510 x4777
To reply to this message either click reply in your e-mail application or click here to access
the Case through the online case form.

>>>>> T324 Support * 1-888-TECH-324 * support@T324.com<<<<<

*Exhibit E*

Fwd: [#1038916251] Invalid Activity Appeal

Today at 2:15 PM

**Craig** <cragotti@aol.com>
To saud.khokhar@yahoo.com

**2ND EMAIL FROM T-324**

------Original Message------
From: Brian Nowell <briann@t324.com>
To: cragotti@aol.com>
Sent: Thu, May 31, 2012 12:22 pm
Subject: FW: [#1038916251] Invalid Activity Appeal

Craig,

Here's the bad news. They're pretty up-front about the fact that they have no intention to give you back your outstanding balance. This really doesn't seem right or fair... they don't even give you enough information to understand how you've violated their terms or anything.

At any time they can just decide not to pay you and give no reason?

Sorry this all went down, Craig. Let me know if there's any way we can help.

-Brian

------Original Message------
From: Google AdSense [mailto:adsense-adclicks@google.com]
Sent: Thursday, May 31, 2012 2:42 AM
To: support@t324.com
Subject: Re: [#1038916251] Invalid Activity Appeal

Hello,

Thank you for your appeal. We appreciate the additional information you've provided, as well as your continued interest in the AdSense program.



Reply, Reply All or Forward | More

The Google AdSense Team

Sincerely,

We understand that you may want more information about your account activity. However, because we have a need to protect our proprietary detection systems, we're unable to provide our publishers with any details about their account activity.

Also, accounts disabled for invalid click activity will receive no further payment nor any reissue of previous payment. Your outstanding balance and Google's share of the revenue will both be fully refunded back to the affected advertisers. Thank you for your understanding in this matter.

Please know that, once we've reached a decision on your appeal, further appeals may not be considered, and you might not receive any further communication from us. Note that AdSense publishers whose accounts are disabled for violations of our Terms and Conditions are not eligible for further participation in AdSense. For this reason, you may not open new accounts.

However, after thoroughly re-reviewing your account data and taking your feedback into consideration, our specialists have confirmed that we're unable to reinstate your AdSense account.

Thank you for your appeal. We appreciate the additional information you've provided, as well as your continued interest in the AdSense program.

Hello,

Subject: Re: [#1038916251] Invalid Activity Appeal
To: support@0x324.com
Sent: Thursday, May 31, 2012 2:42 AM
From: Google AdSense [mailto:adsense-adclicks@google.com]
——Original Message——

-Brian

[#1038916251] Invalid Activity Appeal (2)

*Exhibit F*

Table of Contents

*More individuals are using devices other than personal computers to access the internet. If users of these devices do not widely adopt versions of our web search technology, products, or operating systems developed for these devices, our business could be adversely affected.*

The number of people who access the internet through devices other than personal computers, including mobile telephones, personal digital assistants (PDAs), smart phones, handheld computers, video game consoles, and television set-top devices, has increased dramatically in the past few years. The lower resolution, functionality, and memory associated with some alternative devices make the use of our products and services through such devices more difficult and the versions of our products and services developed for these devices may not be compelling to users, manufacturers, or distributors of alternative devices. Each manufacturer or distributor may establish unique technical standards for its devices, and our products and services may not work or be viewable on these devices as a result. We have limited experience to date in operating versions of our products and services developed or optimized for users of alternative devices, such as Google Mobile and Android, or in designing and selling alternative devices, such as the Nexus One. As new devices and new platforms are continually being released, it is difficult to predict the problems we may encounter in developing versions of our products and services for use on these alternative devices and we may need to devote significant resources to the creation, support, and maintenance of such devices. If we are unable to attract and retain a substantial number of alternative device manufacturers, distributors, and users to our products and services, or if we are slow to develop products and technologies that are more compatible with alternative devices, we will fail to capture a significant share of an increasingly important portion of the market for online services, which could adversely affect our business.

*New technologies could block our ads, which would harm our business.*

Technologies have been developed that can block the display of our ads. Most of our revenues are derived from fees paid to us by advertisers in connection with the display of ads on web pages. As a result, ad-blocking technology could adversely affect our operating results.

*If we fail to detect click fraud or other invalid clicks, we could lose the confidence of our advertisers, which would cause our business to suffer.*

We are exposed to the risk of fraudulent clicks and other invalid clicks on our ads from a variety of potential sources. We have regularly refunded fees that our advertisers have paid to us that were later attributed to click fraud and other invalid clicks, and we expect to do so in the future. Invalid clicks are clicks that we have determined are not intended by the user to link to the underlying content, such as inadvertent clicks on the same ad twice and clicks resulting from click fraud. Click fraud occurs when a user intentionally clicks on a Google AdWords ad displayed on a web site for a reason other than to view the underlying content. While we have implemented systems to identify and reduce fraudulent and invalid clicks, an increase in refunds could negatively affect our profitability and damage our brand.

*Interruption or failure of our information technology and communications systems could hurt our ability to effectively provide our products and services, which could damage our reputation and harm our operating results.*

The availability of our products and services depends on the continuing operation of our information technology and communications systems. Our systems are vulnerable to damage or interruption from earthquakes, terrorist attacks, floods, fires, power loss, telecommunications failures, computer viruses, computer denial of service attacks, or other attempts to harm our systems. Some of our data centers are located in areas with a high risk of major earthquakes. Our data centers are also subject to break-ins, sabotage, and intentional acts of vandalism, and to potential disruptions if the operators of these facilities have financial difficulties. Some of our systems are not fully redundant, and our disaster recovery planning cannot account for all eventualities. The occurrence of a natural disaster, a decision to close a facility we are using without adequate notice for financial reasons, or other unanticipated problems at our data centers could result in lengthy interruptions in our service. In addition, our products and services are highly technical and complex and may contain errors or vulnerabilities. Any

*Exhibit G*

## Table of Contents

We recognize as revenues the fees charged to advertisers each time a user clicks on one of the ads that appears next to the search results or content on our websites or our Google Network Members' websites. For those advertisers using our AdWords cost-per-impression pricing, we recognize as revenues the fees charged to advertisers each time their ads are displayed on our websites or our Google Network Members' websites. We report our Google AdSense revenues on a gross basis principally because we are the primary obligor to our advertisers.

We recognize revenues when the services or products have been provided or delivered, the fees we charge are fixed or determinable, we and our advertisers or other customers understand the specific nature and terms of the agreed upon transactions, and collectability is reasonably assured.

We record deferred revenue upon invoicing or when cash payments are received in advance of our performance in the underlying agreement on the accompanying Consolidated Balance Sheets.

### Cost of Revenues

Cost of revenues consists primarily of traffic acquisition costs. Traffic acquisition costs consist of amounts ultimately paid to our Google Network members under AdSense arrangements and to certain other partners (our distribution partners) who distribute our toolbar and other products (collectively referred to as access points) or otherwise direct search queries to our website (collectively referred to as distribution arrangements). These amounts are primarily based on the revenue share and fixed fee arrangements with our Google Network Members and distribution partners.

Certain distribution arrangements require us to pay our partners based on a fee per access point delivered and not exclusively—or at all—based on revenue share. These fees are non-refundable. Further, these arrangements are terminable at will, although under the terms of certain contracts we or our distribution partners may be subject to penalties in the event of early termination. We recognize fees under these arrangements over the estimated useful lives of the access points (approximately two years) to the extent we can reasonably estimate those lives and they are longer than one year, or based on any contractual revenue share, if greater. Otherwise, the fees are charged to expense as incurred. The estimated useful life of the access points is based on the historical average period of time they generate traffic and revenues. Further, we review the access points for impairment by distribution partner, type, and geography, and we have not made any impairment to date.

Prepaid revenue share and distribution fees are included in prepaid revenue share, expenses, and other assets on the accompanying Consolidated Balance Sheets.

Cost of revenues also includes the expenses associated with the operation of our data centers, including depreciation, labor, energy, and bandwidth costs, credit card and other transaction fees related to processing customer transactions including Google Checkout transactions, amortization of acquired intangible assets, as well as content acquisition costs. We have entered into arrangements with certain content providers under which we distribute or license their video and other content. In a number of these arrangements, we display ads on the pages of our web sites from which the content is viewed and share most of the fees these ads generate with the content providers. To the extent we are obligated to make guaranteed minimum revenue share payments to our content providers, we recognize as content acquisition costs the contractual revenue share amount or on a straight-line basis, whichever is greater, over the terms of the agreements.

### Stock-based Compensation

We have elected to use the BSM option pricing model to determine the fair value of stock options on the dates of grant. Restricted stock units (RSUs) are measured based on the fair market values of the underlying stock on the dates of grant. Shares are issued on the vesting dates net of the minimum